942 F.2d 539
 Frank MARSHALL, Louis Hedlund, Richard Thorp, Kenneth
Berggren, Fred Behnke, and Oliver Bergstrom on
behalf of themselves and all others
similarly situated, Appellees,
v.
GREEN GIANT COMPANY, Appellant.
Frank MARSHALL, Louis Hedlund, Richard Thorp, Kenneth
Berggren, Fred Behnke, and Oliver Bergstrom on
behalf of themselves and all others
similarly situated, Appellants,
v.
GREEN GIANT COMPANY, Appellee.
 Nos. 90-5528, 90-5529.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 16, 1991.
Decided Aug. 22, 1991.
Rehearing and Rehearing En Banc
Denied Oct. 8, 1991.
 
 James B. Lynch, Minneapolis, Minn., for appellant.
 Richard S. Florsheim, Milwaukee, Wis., argued (David F. Fisher, Minneapolis, Minn., and John R. Dawson, Milwaukee, Wis., on brief), for appellees.
 Before JOHN R. GIBSON, Circuit Judge, and FLOYD R. GIBSON and ROSS, Senior Circuit Judges.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Several Minnesota farmers under contract to provide vegetables to Green Giant Company ("Green Giant") appeal the district court's dismissal of six counts of their lawsuit against Green Giant. Green Giant cross-appeals the district court's confirmation of an arbitrator's award. We affirm in all respects save one; we vacate the dismissal of one of the farmers' counts and remand for further proceedings.
 
 I. BACKGROUND
 A. Factual History
 
 2
 Green Giant purchases large quantities of raw vegetables from farmers, processes them, and then markets them. Prior to 1974, Green Giant entered into only fixed-price contracts with growers. These contracts were typically entered early in the calendar year, while the harvest typically occurred later in the year. Consequently, the growers bore the risk that the price of vegetables would increase between the time the contracts were entered and the time the vegetables were harvested and Green Giant bore the risk that the price of vegetables would drop during that same period.
 
 
 3
 Sometime in 1974, Green Giant began to offer sweet corn growers the option of entering variable-price contracts. There was no organized futures market for sweet corn, but such markets did exist for field corn; thus, Green Giant developed a ratio equating the value of sweet corn produced to the value of field corn produced.[1] Initially, through the use of this ratio, the variable-price contracts tied the price of sweet corn to the price of field corn as reported by the Minnesota Crop and Livestock Reporting Board. However, because the price of corn increased, Green Giant was forced to pay those growers who opted for variable-price contracts more than Green Giant had expected to pay. Consequently, Green Giant developed a means whereby it could continue to offer growers variable-price contracts, yet at the same time protect itself from large increases in the price of corn.
 
 
 4
 Under this program, growers entered into contracts with Green Giant and, at that time, chose to be paid either a fixed compensation or to be paid pursuant to the "Green Line Futures Program" (hereinafter "the Program").[2] Under the Program, the price to be paid the growers of sweet corn would fluctuate depending upon the price of field corn as reflected on the Chicago Board of Trade. At certain times after electing to participate in the Program, growers could elect to fix the price they were to be paid based on the price of field corn then reflected at the Chicago Board of Trade.
 
 
 5
 Green Giant engaged in "hedging" by purchasing and selling field corn futures on the Chicago Board of Trade in order to protect itself from the risk of increased liability to the growers enrolled in the Program caused by increases in the price of field corn. Green Giant's purchases of futures were computed based on the amount of sweet corn Green Giant expected to purchase from Growers who had opted to participate in the Program. Green Giant did not invest in futures for the purpose of making a profit; rather, Green Giant hoped to purchase and sell a sufficient amount of corn futures to offset any losses incurred in paying the growers enrolled in the Program.
 
 
 6
 The plaintiffs (hereinafter "the growers") all opted to participate in the Program in 1981. Their contracts provided that they were to be paid in two installments: the first, known as the Schedule A payment, was to take place on October 19, 1981; the second (Schedule B) was to take place on June 1, 1982. The growers' contracts provided that "[i]f the Green Line Program is exercised the Schedule 'B' payment will be adjusted as appropriate." The contracts also contained a clause providing that all controversies or claims arising from the contracts would be arbitrated.
 
 
 7
 During 1981, the price of field corn futures dropped significantly; consequently, many growers in the Program received more money in the Schedule A payment than they were due under the entire contract, and their Schedule B payment was to be, at best, nothing. Green Giant, relying on the language in the contract allowing for adjustment of the Schedule B payment, believed that the Schedule B payments could be "adjusted" to negative numbers. Green Giant acted on this belief by billing these growers for the difference between the Schedule A payment and the total amount actually due. Some growers paid this difference, while others did not.
 
 B. Procedural History
 
 8
 The named plaintiffs filed suit against Green Giant in federal district court in May 1983, alleging seven theories of liability. Counts I through IV alleged that Green Giant failed to register under various provisions of the Commodity Exchange Act (CEA).[3] Count V alleged that Green Giant failed to provide a risk disclosure statement as required by 17 C.F.R. §§ 1.55, 4.21(a)(17), 4.31(a)(7) (1981). Count VI alleged violations of Minnesota's security laws, and Count VII alleged breach of contract. In June 1984, the district court[4] dismissed Counts I through IV because there was no private right of action under the CEA, and dismissed Count VI because the CEA preempted state security law claims. Green Giant also moved for a stay pending arbitration, but the district court concluded that issues of fact needed to be resolved in an evidentiary hearing in order to determine whether a stay was appropriate.
 
 
 9
 At the evidentiary hearing before the district court,[5] the growers opposed the motion for a stay, emphasizing that the key issue was whether Green Giant was a futures commission merchant (hereinafter "FCM") or an associated person under the CEA; if Green Giant was an FCM or associated person, then the arbitration clause would have been unenforceable because the arbitration clause did not comply with the requirements of 17 C.F.R. § 180.3(b) (1981). In late November 1985, the district court conducted a four-day evidentiary hearing during which the growers put on several witnesses, including expert witnesses, in an attempt to prove that Green Giant was an FCM[6] and that the arbitration provision was consequently unenforceable. On January 6, 1986, the district court concluded that Green Giant was not an FCM and ordered that the proceedings be stayed pending arbitration of the breach of contract claims.
 
 
 10
 In February 1986, the growers requested that the district court enter final judgment. The growers reasoned that Counts I through IV and VI had already been dismissed, and the court's January 6 order effectively dismissed Count V because of its holding that Green Giant was not an FCM; liability under Count V could not exist unless Green Giant was an FCM. On March 25, 1986, the court denied the growers' motion without explanation.
 
 
 11
 At some time during these proceedings, the parties entered into a stipulation.[7] Though the parties expressly disagreed as to whether 17 C.F.R. § 180.3 applied to the growers' contracts, they did agree that if Green Giant was required to comply with that regulation the arbitration agreements were void and unenforceable. The record does not reflect, and the parties do not explain, the purpose or extent to which this stipulation was utilized by them or the district court in the hearing on the motion to stay.
 
 
 12
 The parties proceeded to arbitration of the contract claims of one of the named plaintiffs (Louis Hedlund). Hedlund argued that the language in the contract did not permit Green Giant to bill him. The arbitrator agreed with Hedlund and ruled in his favor.
 
 
 13
 The parties then returned to district court. The growers sought confirmation of the arbitrator's award and partial summary judgment in favor of the remaining plaintiffs. Green Giant did not oppose confirmation of the award, but argued that the collateral estoppel effect of that award was a matter for the arbitrator, not the court, to decide. The district court agreed with Green Giant and, in January 1988, confirmed the award and referred the collateral estoppel question to arbitration. At the same time, the district court noted that the only claims remaining in the suit were state-based claims, and that there was no diversity of citizenship. In reaching this conclusion, the court did not explain the fate of the federal claims contained in Count V. Nonetheless, the court elected to retain jurisdiction (on a theory of pendent jurisdiction) because "[m]otions of some considerable substance" had already been decided in federal court, and the case had been pending for almost five years.
 
 
 14
 The parties returned to arbitration; the five remaining named plaintiffs moved to have their arbitrations consolidated, which motion was granted by the arbitrator. The arbitrator then determined that the result of the Hedlund arbitration collaterally estopped Green Giant from claiming it could collect negative Schedule B payments from the other growers. The parties then returned to district court; the growers sought confirmation of the second arbitration award, class certification, and judgment in favor of the class based on the arbitrator's decision on collateral estoppel. Green Giant opposed these motions. In September 1990, the district court confirmed the arbitrator's second award, but decided not to certify the class because no federal issues remained in the case. Final judgment was entered on September 14, 1990, and both parties appeal.
 
 II. DISCUSSION
 
 15
 A. The Existence of a Private Right of Action
 
 
 16
 In 1982, Congress amended the CEA by allowing a private right of action for anyone suffering actual damage as a result of a violation of any portion of the CEA. 7 U.S.C. § 25(a) (1982). By its terms, this private right of action applies to causes of action accruing on or after January 11, 1983; however, the creation of this right "shall not affect any right of any parties which may exist with respect to causes of action accruing prior to such date." Id. § 25(d). Prior to 1982, the CEA (which was first passed in 1936) was amended in 1974 and 1978; however, those amendments, as well as the CEA as a whole, failed to expressly provide for a private right of action. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 367, 102 S.Ct. 1825, 1833-34, 72 L.Ed.2d 182 (1982). Because a private right of action was not expressly permitted by Congress at the time the growers' actions accrued, the growers can pursue their claims under the CEA only if a private right of action may be implied under the CEA.
 
 
 17
 In Merrill Lynch, the Supreme Court addressed whether a private right of action existed under certain provisions of the CEA prior to Congress' express creation of such a right. The growers would have us blindly apply Merrill Lynch and declare that a private right of action existed in favor of those aggrieved by violations of all aspects of the CEA. However, such an application would greatly enlarge the true holding of Merrill Lynch, which involved only five anti-fraud sections of the CEA and none of the CEA's registration provisions.[8] Because of this difference, and because of the nature of the inquiry conducted by the Court in Merrill Lynch, we believe that Merrill Lynch does not provide an automatic answer in the growers' favor.
 
 
 18
 The Court noted that the key to deciding whether a private right of action exists is determining "the intent of Congress in 1974 when it comprehensively reexamined and strengthened the federal regulation of futures trading." Id. at 378, 102 S.Ct. at 1838. The Court went on to describe the appropriate analysis thusly:
 
 
 19
 In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.
 
 
 20
 Id. at 378-79, 102 S.Ct. at 1839 (footnote omitted). From this statement, we discern that we must first determine whether a private right of action existed under the CEA's registration provisions when Congress overhauled the CEA in 1974. If one did exist prior to 1974, the question is whether Congress intended to preserve it; if one did not exist prior to 1974, the question is whether Congress intended to create one when it passed the 1974 Amendments to the CEA.
 
 
 21
 1. Did a Private Right of Action Exist Prior to 1974?
 
 
 22
 With regard to two of the three registration provisions at issue, the pre-1974 law is very easy to ascertain. Sections 6k and 6m of Title VII were passed as part of the 1974 Amendments to the CEA; prior to 1974 courts obviously did not allow a private right of action for violations of these sections.
 
 
 23
 Section 6d did exist prior to 1974. However, there was not the "routine recognition of a private remedy" under section 6d comparable to that found by the Supreme Court in Merrill Lynch. In fact, we can locate no cases prior to 1974 that expressly address whether the CEA's registration provisions give rise to a private right of action. The only case relied upon by the growers, Anderson v. Francis I. DuPont & Co., 291 F.Supp. 705 (D.Minn.1968), did not interpret the CEA; instead, the cause of action was pleaded under the Securities and Exchange Acts of 1933 and 1934. Id. at 707. Although there was a factual allegation that one of the defendants was not registered as required by the CEA, id. at 706, it does not appear that this allegation formed an independent cause of action. Moreover, the opinion does not even discuss the existence of a private right of action under the CEA, and thus cannot represent the "routine recognition" of a private remedy that was described in Merrill Lynch. We conclude that Congress could not have intended to preserve existing private rights of action under sections 6d, 6k, or 6m because no such rights of action existed in 1974.
 
 
 24
 2. Did Congress Intend to Create a Private Right of Action in 1974?
 
 
 25
 Whether Congress meant to implicitly create a private right of action is to be determined by using the factors outlined in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). See Thompson v. Thompson, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). The Cort test, as subsequently summarized by the Supreme Court, requires us to examine the following factors:
 
 
 26
 "First, is the plaintiff one of the class for whose especial benefit the statute was enacted, ...--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"
 
 
 27
 California v. Sierra Club, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981) (quoting Cort, 422 U.S. at 78, 95 S.Ct. at 2088) (internal quotations omitted) (emphasis in original). Applying these factors, we are convinced that Congress did not intend to create a private right of action for violations of the CEA's registration provisions.
 
 
 28
 The registration provisions do not extend protections or rights to a specific class of people, nor do they specifically prohibit specific forms of conduct. Cf. Touche Ross & Co. v. Redington, 442 U.S. 560, 569, 99 S.Ct. 2479, 2485-86, 61 L.Ed.2d 82 (1979). Instead, the registration provisions exist as part of a larger scheme designed to protect the public at large. The mere fact that those who deal with unregistered FCM's may suffer greater harm than other members of the public is insufficient to infer that Congress intended to protect a special class of people. See Sierra Club, 451 U.S. at 294, 101 S.Ct. at 1779-80.
 
 
 29
 The CEA's legislative history prior to 1982 does not reflect Congress' intent in this regard. The growers find great meaning in Congress' passage, in 1982, of a provision specifically allowing for private rights of action. However, this legislative act does not speak with a clear meaning. It could suggest, as the growers urge, that Congress always intended for there to be a private right of action for CEA violations. On the other hand, it could mean that Congress, realizing that no private right of action existed, intended to create a private right where none previously existed. This latter interpretation is more likely given that Congress, in creating this new right, saw a need to specifically provide that the newly created private right of action was not to affect rights of parties accruing prior to the passage of the new law. 7 U.S.C. § 25(d) (1982). This caveat indicates that Congress believed the 1982 amendment was effecting a substantive change in the law as opposed to merely codifying prior judicial practice. Congress' intent is ambiguous at best, and more likely suggests that no private right existed with regard to the registration provisions prior to 1982.
 
 
 30
 With regard to the third Cort factor, we do not believe that it would have been consistent to infer a private right of action for violations of the registration provisions, primarily because such an action already existed in favor of those that suffered actual damage from fraud. A party does not suffer damage merely by dealing with an unregistered FCM; failure to register, without more, does not cause pecuniary loss. Even now, after Congress explicitly created a private right of action, a potential plaintiff can collect only actual damages. Id. § 25(a). The CEA's purposes would not be promoted by allowing the cause of action sought by the growers. Finally, we note that the fourth Cort factor is inconsequential. State law does not provide a remedy such that inferring a private right of action would tread on state interests; nonetheless, in light of the Cort factors taken as a whole, with the necessary emphasis on Congress' intent, we do not believe that a private right of action can be inferred. The district court's dismissal of Counts I-IV is therefore affirmed.
 
 B. The Motion to Stay Proceedings
 
 31
 The growers raise a series of complaints about the district court's actions while it disposed of Green Giant's motion to stay. These arguments are interconnected and are not subject to easy division. Consequently, we address them together.
 
 
 32
 First, the growers contend that the district court, while deciding whether to grant the motion to stay pending arbitration, did not need to decide whether Green Giant was an FCM. The growers concede that the breach of contract claims (Count VII) were arbitrable and a stay was proper as to those claims, but contend that the claims under the CEA (Count V) were not arbitrable, regardless of whether Green Giant was an FCM. They reason that if Green Giant was an FCM, then the CEA claims were not arbitrable because the parties had stipulated that the arbitration clause failed to meet the requirements of 17 C.F.R. § 180.3 (1981) and hence was unenforceable. If, on the other hand, Green Giant was not an FCM, then there would be no claim under the CEA at all, inasmuch as the elements of a violation under the CEA required that Green Giant be an FCM. Consequently, the judge should have granted the stay as to Count VII, denied the stay as to Count V, and allowed Count V to proceed to trial.
 
 
 33
 The growers are, as a matter of logic, correct. The district court did not need to decide whether Green Giant was an FCM in order to rule on the motion for a stay (as to Count VII) because the parties effectively stipulated that the clause was unenforceable as to claims arising under the CEA (Count V). Being correct on this point, however, does not mean that the growers are entitled to relief on appeal. The record contains numerous motions, briefs, and other materials submitted to the district court by the growers reflecting the growers' belief that Green Giant's success on its motion to stay would depend upon whether Green Giant was an FCM. The growers did insist that the court not decide this issue in hopes of discouraging the district court from granting the stay, but in so doing failed to present the precise argument they now advance on appeal. Having argued to the district court that this issue was crucial to the court's disposition of the motion to stay, the growers cannot expect relief by complaining that the district court did not need to decide the issue. We will, therefore, discuss the growers' remaining arguments regarding this stage of the proceedings from the same viewpoints presented by the parties to the district court; namely, that the court had to decide whether Green Giant was an FCM in order to rule on the motion for stay.
 
 
 34
 The growers also argue, as they did in the district court, that the district court should not have decided whether Green Giant was an FCM (even though that issue was alleged to be critical to the disposition of the motion to stay) because to do so would force the district court into deciding the merits of the growers' other claims. Despite the growers' protestations, however, the district court did not act improperly.
 
 
 35
 The district court was obligated to determine whether the arbitration agreement was enforceable. See AT & T Technologies v. Communication Workers of Am., 475 U.S. 643, 649, 106 S.Ct. 1415, 1418-19, 89 L.Ed.2d 648 (1986); I.S. Joseph Co. v. Michigan Sugar Co., 803 F.2d 396, 400 (8th Cir.1986). This obligation did not disappear merely because the topic of enforceability involved issues or facts that were likely to arise again elsewhere in the proceedings. The growers' contention that prior opinions from both this court and the Supreme Court prohibit the district courts from deciding "the merits" when deciding whether to stay proceedings pending arbitration is misguided. The decisions relied upon by the growers warned district courts not to decide the merits of the dispute headed for arbitration; none of those decisions prohibit a district court from addressing the arbitration clause's enforceability merely because the issues involved may recur elsewhere in the case. See AT & T, 475 U.S. at 649-50, 106 S.Ct. at 1418-19; I.S. Joseph, 803 F.2d at 399; Contracting Northwest, Inc. v. City of Fredericksburg, 713 F.2d 382, 385 (8th Cir.1983). Having been assured that the enforceability of the arbitration clause turned on whether Green Giant was an FCM, the district court was not prohibited from deciding that issue merely because Green Giant's status as an FCM was relevant to other claims, even though those claims were themselves non-arbitrable.
 
 
 36
 Next, the growers complain that the district court relied on findings made while disposing of the motion to stay to dismiss their claims under Count V. This was allegedly improper because it denied the growers their right to a jury trial on the issues in Count V. Before addressing the growers' argument on this point, we must ascertain the basis for the district court's dismissal of Count V.
 
 
 37
 Green Giant would have us believe that the court's findings regarding the motion to stay as announced in its January 6, 1986, memorandum decision were totally nondispositive. Green Giant further contends that final judgment was entered against the growers on Count V because the growers failed to pursue their CEA claims in the arbitration. We disagree with Green Giant's characterization of the district court's actions. The district court first intimated that federal claims were lacking in its order confirming the Hedlund arbitration. Marshall v. Green Giant Co., No. 4-83-578, slip op. at 3, 1988 WL 282 (D.Minn. Jan. 4, 1988). Such an observation would have been impossible unless the court's prior decision that Green Giant was not an FCM had some dispositive weight. Moreover, the court could not have based this observation on the growers' failure to raise the issue in arbitration because only Hedlund had gone to arbitration; the remaining plaintiffs had not yet failed to raise the issue. Finally, and perhaps most importantly, when the district court awarded final judgment it stated that it had "disposed of all but two state law claims, in orders dated June 26, 1984, and January 6, 1986. The January 6, 1986, order also stayed all other proceedings pending arbitration." Marshall v. Green Giant Co., No. 4-83-578, slip op. at 13, 1990 WL 134425 (D.Minn. Sept. 13, 1990). This language clearly demonstrates that the district court used the findings it made during the hearing on the motion for stay as a basis for dismissing Count V. The court did not indicate that judgment on Count V was based on the growers' failure to raise those claims in arbitration; in fact, the growers were not obligated to raise those claims in arbitration because it was stipulated that the arbitration clause was unenforceable as to the CEA claims.[9]
 
 
 38
 Because we agree with the growers that the district court relied on its finding that Green Giant was not an FCM as a means to dismiss Count V, we must determine whether this was a proper action. No reported case directly addresses this issue. However, we note that, in many respects, findings made by district courts when disposing of motions to stay pending arbitration are treated the same as other findings made after a bench trial. In Fogarty v. Piper, 767 F.2d 513, 515 (8th Cir.1985), we required that district courts provide findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 when disposing of such motions. Rule 52 applies "[i]n all actions tried upon the facts without a jury...." Furthermore, when reviewing the district court's factual findings, we apply the same clearly erroneous standard that is applied when reviewing the court's findings after a bench trial. Nordin v. Nutri/System, Inc., 897 F.2d 339, 344 (8th Cir.1990).
 
 
 39
 In short, the growers have already received the equivalent of a trial on the issue of whether Green Giant was an FCM, and we are unwilling to allow the growers the proverbial "two bites at the apple." Such an opportunity, if granted, would be an obvious duplication of effort; the issue of Green Giant's status was decided by a factfinder empowered to decide the issue given the posture of the case, and the growers now wish to have a different factfinder decide the very same issue. There is a need for decisions to have some recognized finality within the context of a given case in order for the case to proceed to a logical and definitive conclusion. The court's findings formed the basis for certain definite actions; namely, the grant of the stay. For the sake of an orderly process, those findings must hold true for other aspects of the case.
 
 
 40
 Finally, we review the district court's finding that Green Giant was not an FCM; as indicated above, we review such factual findings for clear error. Nordin, 897 F.2d at 344. Our review of the transcripts and other documents in the record on appeal does not leave us "with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quotation omitted). In fact, we agree with the district court that Green Giant was merely engaged in hedging, and did not accept orders for, from, or on behalf of the growers. Consequently, we affirm the district court with respect to its dismissal of Count V of the growers' complaint.
 
 C. Preemption of State Law
 
 41
 The district court held that the CEA preempted state security law, and we do not necessarily disagree with this conclusion. However, we see no need to reach this issue in light of our affirmance of the district court's later determination that Green Giant was not an FCM. Assuming, arguendo, that the CEA preempts state security law, such preemption can occur only if the CEA applies to the events in question. Because the district court held, and we affirm, that the CEA does not apply to the events at issue, the CEA cannot be said to preempt the growers' state security law claims.
 
 
 42
 We have no doubt that the sequence of events in the district court caused this point to be lost in the procedural shuffle. The district court decided the preemption issue early in the proceedings within the context of a motion to dismiss, and in so doing properly accepted the facts alleged in the growers' complaint as true. However, the facts alleged in the complaint were later determined to be not true; unfortunately, the growers never asked the district court to resolve the anomaly presented in light of the earlier ruling. In spite of the growers' failure in this regard, we see no principled reason for not correcting an obvious error. Consequently, we vacate the district court's dismissal of Count VI and remand for further proceedings consistent with this opinion.
 
 
 43
 D. The District Court's Refusal to Continue Exercising Pendent Jurisdiction
 
 
 44
 After the arbitrator determined that the Hedlund award could be used to bind Green Giant in future arbitrations, the growers renewed their request for class certification. The district court refused, citing the lack of federal claims in the case; it dismissed the suit without prejudice to the growers' right to pursue such a claim in state court. The growers allege that this action was erroneous. We disagree.
 
 
 45
 The district court has the discretion to exercise (or refuse to exercise) its pendent jurisdiction. E.g., Hassett v. Lemay Bank & Trust Co., 851 F.2d 1127, 1130 (8th Cir.1988). When deciding whether to exercise its discretion, the district court should consider the stage at which the federal claims were disposed of, "the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum." Koke v. Stifel, Nicolaus & Co., 620 F.2d 1340, 1346 (8th Cir.1980). Given the deferential standard of review, and given the factors that are to be weighed, the district court did not abuse its discretion.
 
 
 46
 The final federal claims were disposed of at a relatively late stage of the proceedings, and the district court conceded that a significant amount of judicial resources had already been devoted to the case. However, even if we concede that the issues are relatively straightforward, the growers ask for further significant contributions of federal judicial resources in order to dispose of state claims. It goes without saying that class actions are very complex and represent a significant drain on the court in terms of time and management. We also note that the growers can pursue their efforts in state court just as easily as they can pursue them in federal court. See Minn.R.Civ.P. 23.
 
 
 47
 The growers, recognizing the heavy burden they bear, contend that the district court abused its discretion in light of its earlier (January 1988) decision to retain pendent jurisdiction, even though it recognized at that time that no federal issues remained. We do not agree. When the district court retained jurisdiction, the next step of the proceedings required that the parties return to arbitration to determine whether the arbitrator's ruling in favor of Hedlund was entitled to collateral estoppel effect. All that the court had to do was rule on future motions to confirm the arbitrator's rulings, which would not significantly impose upon the court's resources. Because of the heavier burdens involved in administering a class action suit, the balance easily tips in favor of the district court's later decision not to retain pendent jurisdiction.
 
 
 48
 E. The Arbitrator's Decision to Apply Offensive Collateral Estoppel
 
 
 49
 In its cross-appeal, Green Giant challenges the arbitrator's decision to grant collateral estoppel effect to the Hedlund arbitration in the remaining arbitration cases. Green Giant contends that offensive collateral estoppel was inappropriate in light of earlier arbitration decisions in its favor on this same issue. We affirm the district court's confirmation of the arbitrator's decision due to the limited grounds available for federal courts to upset arbitrators' decisions.
 
 
 50
 The Federal Arbitration Act "allow[s] an award to be disturbed when the process was seriously subject to question, see 9 U.S.C. § 10(a), (b), (c), when the arbitrators 'exceeded their powers,' see 9 U.S.C. §§ 10(d), 11(b), or when a simple formal, descriptive, or mathematical mistake was made, see 9 U.S.C. § 11(a), (c)." Stroh Container Co. v. Delphi Indus., 783 F.2d 743, 749 (8th Cir.), cert. denied, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986). None of these statutory bases allows this court to intrude upon the arbitrator's decision in this case.
 
 
 51
 Green Giant insists that the arbitrator's decision to apply collateral estoppel exhibited manifest disregard of the law, which the Supreme Court recognized in dicta as a possible ground for vacating an award in Wilko v. Swan, 346 U.S. 427, 436-37, 74 S.Ct. 182, 187-88, 98 L.Ed. 168 (1953). Wilko, however, was overruled by a 5-4 vote in Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). This circuit has never adopted manifest disregard as a basis for vacating an arbitrator's award, and we will again refrain from deciding whether to do so or not because the arbitrator did not exhibit manifest disregard for the law. Cf. Stroh Container, 783 F.2d at 750.
 
 
 52
 Manifest disregard of the law exists when the arbitrator commits an error that was "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir.1986). "[T]here must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it." O.R. Secs. v. Professional Planning Assoc., 857 F.2d 742, 747 (11th Cir.1988). Green Giant has failed to demonstrate that the arbitrator both recognized and ignored the law regarding collateral estoppel. Green Giant has made several convincing arguments demonstrating that offensive collateral estoppel should not have been applied, and our decision may well have been different had the decision been made by a district court instead of an arbitrator. However, even if we agree with Green Giant that the arbitrator made an error of law, we still cannot say that the arbitrator disregarded the law. See Bobker, 808 F.2d at 933 (manifest disregard "means more than error or misunderstanding with respect to the law.").
 
 
 53
 Green Giant also argues that we should vacate the decision because Green Giant was prevented from presenting the arbitrator with relevant evidence in violation of 9 U.S.C. § 10(c). The evidence in question consists of documents and other proof of the individual growers' actual understandings of the meaning of their contracts with Green Giant. Green Giant's argument misses the mark; this evidence was relevant only if it would have had a bearing on the case, and the evidence could have had no bearing on the case because the arbitrator decided that Green Giant was collaterally estopped from relitigating the meaning of the contracts. If we vacated the arbitrator's decision to apply collateral estoppel, then the evidence would be relevant and Green Giant would have an opportunity to present it to an arbitrator; however, because we affirm the arbitrator's decision in this regard, Green Giant's rights were not impaired because of its inability to present this evidence.
 
 III. CONCLUSION
 
 54
 We vacate the dismissal of Count VI and remand for further proceedings consistent with this opinion. In all other respects we affirm the district court.
 
 
 
 [1]
 One of the major differences between field corn and sweet corn is that field corn is usually traded in bushels, whereas sweet corn is normally traded in tons
 
 
 [2]
 Green Giant's new program, which was offered until 1982, was known by a variety of names: from 1976 through 1978 it was known as the "Green Line Program," from 1979 through 1981 it was called the "Green Line Futures Program," and in 1982 its name returned to the "Green Line Program." The plaintiffs all signed their contracts in 1981; hence, they were enrolled in the Green Line Futures Program. Our description of the Green Line Futures Program applies to the 1981 version; the various programs may have operated differently between 1976 and 1982, but any differences are not relevant to our disposition of this case
 
 
 [3]
 Count I alleged Green Giant failed to register as a Futures Commission Merchant as required by 7 U.S.C. § 6d (1976 & Supp. V 1981); count II alleged failure to register as an "associated person" as required by 7 U.S.C. § 6k (1976 & Supp. V 1981), and counts III and IV, respectively, alleged failure to register as a commodity trading advisor and a commodity pool operator, both as required by 7 U.S.C. § 6m (1976 & Supp. V 1981)
 
 
 [4]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota
 
 
 [5]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota. The case was transferred from Judge Murphy to Judge Rosenbaum on August 29, 1985
 
 
 [6]
 In the interest of brevity, the term "FCM" will be intended to include "associated persons" within the meaning of the CEA
 
 
 [7]
 We are not exactly sure when the stipulation was entered, or when it was filed with the district court. The only copy of the stipulation provided in the record was signed only by the growers' attorney, and that signature is dated November 22, 1985. We have no doubt, however, that the parties did enter the stipulation because Green Giant frequently refers to the stipulation in its brief
 
 
 [8]
 The sections involved were 6a, 6b, 7(d), 7a(8), and 13(b). Merrill Lynch, 456 U.S. at 369 n. 42, 372 n. 49, 102 S.Ct. at 1834 n. 42, 1836 n. 49
 
 
 [9]
 Green Giant also contends that the district court's refusal to enter judgment when requested by the growers in February 1986 demonstrates that the January 6 finding was nondispositive. We disagree, not only for the reasons given, but because the district court provided no explanation in refusing to enter final judgment; hence, we do not know why the district court refused to enter final judgment when requested by the growers