Dianne HANSON, Plaintiff,

v.

HANCOCK COUNTY MEMORIAL HOSPITAL, Hancock County Memorial Hospital Board of Trustees, Lyola Tulp, Lawrence Crail, Clayton Greiman, Dean Cataldo, Dorothy Larson, Lois Schroeder, Patricia Dewaard, Steve Palmer and Al Denny, Defendants.

No. C 95–3041–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Aug. 15, 1996.

T.J. Braunschweig of the Braunschweig Law Firm, Algona, IA, for plaintiff Dianne Hanson.

Earl W. Hill of Britt, IA, Don N. Kersten and Angela J. Ostrander of Kersten & Carlson, Fort Dodge, IA, and Jaki K. Samuelson of Whitfield & Eddy, P.L.C., Des Moines, IA, for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ................................... 1424

II. STANDARDS FOR SUMMARY JUDGMENT ............................. 1425

III. FINDINGS OF FACT .............................................. 1427
 A. Undisputed Facts ............................................ 1427
 B. Disputed Facts ............................................. 1429

IV. LEGAL ANALYSIS ............................................... 1430
 A. The Federal "Due Process" Claim ......................... 1430
 1. The due process "privacy" claim ..................... 1430
 2. The "sick leave" due process claim ................. 1432
 B. Disposition Of State–Law Claims ........................ 1433
 1. Absence of a federal claim ......................... 1433
 2. Invasion of privacy ................................ 1434
 a. Forms of the tort asserted here ............... 1435
 b. Disposition of Hanson's invasion of privacy claims ... 1436
 3. Conversion of "property" interest in privacy ........ 1438
 a. The "conversion" cause of action under Iowa law ... 1438
 b. "Conversion" of "intangible" interests ........ 1439
 4. Intentional infliction of emotional distress ......... 1439
 a. Elements of the tort .......................... 1440
 b. Outrageousness ............................... 1440
 c. Emotional distress ............................ 1442
 5. Discharge in violation of public policy ............. 1443
 a. Retaliation based on sick leave ............... 1445

b. Retaliation based on an assertion of confidentiality ................. 1445
6. Malicious prosecution and abuse of process ............................ 1446
a. Malicious prosecution ......................................... 1446
b. Abuse of process ............................................. 1447
c. The improper prosecution claims here ........................... 1448

V. CONCLUSION ................................................. 1449

BENNETT, District Judge.

When a plaintiff brings as many claims as might arise from allegedly wrongful conduct of a defendant as plaintiff believes have a colorable basis in law and fact, the court finds that defendants often respond by asking the court, in motions to dismiss or for summary judgment, to separate the wheat from the chaff. Here, just prior to trial, the court must decide which of seven claims, some of which have two variants, should proceed to trial. The plaintiff alleges wrongful conduct against her by a hospital where she was both an employee and a patient. She alleges that this wrongful conduct ultimately led to her termination as an employee of the hospital. The claims alleged include federal constitutional claims of violation of due process, and state law claims of invasion of privacy, conversion, intentional infliction of emotional distress, discharge in violation of public policy, malicious prosecution, and abuse of process. The hospital asserts that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on all seven claims.

## I. INTRODUCTION AND BACKGROUND

Plaintiff Dianne Hanson filed her complaint in this matter in the Iowa District Court for Hancock County on April 11, 1995, alleging seven causes of action against her former employer, defendant Hancock County Memorial Hospital, its board of trustees, and members of the board or employees of the hospital. All defendants are referred to collectively herein as "the Hospital." The Hospital removed the action to federal court on May 8, 1995, pursuant to 28 U.S.C. § 1441(a) and (c). Removal was on the basis that one

of Hanson's causes of action, brought pursuant to 42 U.S.C. § 1983, alleged violations of the Fourteenth Amendment to the U.S. Constitution, thus presenting a federal question upon which to invoke the jurisdiction of this court. All of the other claims, pendent state-law claims, were also removed. Hanson's motion to remand some or all of the claims to state court was denied, as was her motion for default judgment.

The Hospital answered the original complaint on May 26, 1995, denying the seven claims stated therein. The original seven causes of action allege wrongful conduct on the part of the Hospital against Hanson in her status as both a patient and an employee. Hanson alleges that the Hospital's wrongful conduct ultimately led to Hanson's termination as an employee of the Hospital on October 20, 1994. On January 12, 1996, a magistrate judge of this district granted Hanson's motion to amend the complaint to add an eighth cause of action, captioned as an "Amendment To Petition" and designated as another "Count I." The "Amendment To Petition" was filed on January 16, 1996.[1] However, the court granted the Hospital's motion to dismiss this eighth cause of action on April 15, 1996. Thus, only the original seven causes of action are before the court.

Precisely what those seven causes of action are is not altogether clear from the briefing of the parties. However, the court takes recourse, at least in the first instance, to the complaint itself for identification of Hanson's claims. Count I alleges breach of Hanson's right to privacy while a patient at the Hospital. Hanson alleges that breach of her right of privacy resulted in the Hospital, as her employer, terminating her from her position

---

1. This eighth cause of action alleged that following Hanson's termination on October 20, 1994, the Hospital designated accrued vacation pay due Hanson for allocation to the week of October 23, 1994, without advising her or consulting her about that designation. Hanson contended that the improper designation resulted in her investigation for unemployment benefits fraud by the Iowa Department of Job Service.

in the Hospital's dietary and food service department. Count II alleges that the defendants "refused to maintain said confidentiality [of Hanson's hospital patient records] and converted hospital patient information for their own use." Complaint, ¶ 5. The complaint alleges that the value of the converted "property" right to privacy is $272,-380.00, and therefore seeks this sum as actual damages. Complaint, ¶¶ 5–7, and prayer. Count III is a claim of intentional infliction of emotional distress, in which Hanson asserts that the Hospital acted outrageously in two ways. First, she alleges that the Hospital acted outrageously in making public information concerning her stay in the Hospital after she requested absolute confidentiality. Second, she alleges it was outrageous for the Hospital to use the confidential information for the purpose of firing her rather than for her medical treatment. Count IV is a claim for wrongful discharge in violation of public policy. The complaint alleges that Hanson's termination was motivated by the Hospital's belief that Hanson would make a claim for sick leave benefits. In the alternative, Hanson alleges that the Hospital fired her in retaliation for her efforts to maintain her right to confidentiality of her hospitalization. Count V asserts a claim of malicious prosecution, founded on allegations that the Hospital wrongfully prosecuted an action to deny Hanson unemployment benefits, but that the proceedings in question, administrative proceedings before the Iowa Department of Job Service, ended favorably to her. Count VI, which is founded on similar allegations, alleges that the Hospital abused legal process in the Job Service proceedings to compel Hanson to disclose confidential information concerning her stay at the Hospital. Count VII states the federal claim upon which the removal jurisdiction of this court is predicated. It asserts a claim pursuant to 42 U.S.C. § 1983 for violation of Hanson's Fourteenth Amendment right to due process, because

Hanson alleges that she was deprived of her property right to sick leave benefits without a pre-deprivation hearing. Hanson seeks actual and punitive damages on each of these claims.

Defendants moved for summary judgment on all of Hanson's claims on June 3, 1996. Owing to various extensions, and the piecemeal filing of portions of her response,[2] Hanson's resistance to the motion for summary judgment was not completed until August 8, 1996. The court must therefore rule upon the motion promptly, in light of the imminent trial of this matter, which is scheduled to begin September 3, 1996. The court's consideration of the motion begins with a recitation of the standards for summary judgment, continues with a discussion of the undisputed and disputed facts as demonstrated by the record in this case, and turns finally to the legal analysis of each of Hanson's claims.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555);

---

2. On June 24, 1996, Hanson requested additional time to resist the motion for summary judgment. That request was granted, giving Hanson until July 22, 1996, to respond to the motion for summary judgment. Hanson filed a resistance on July 22, 1996, with a request for an extension of time to file supporting materials. The court granted Hanson until August 5, 1996, to complete her resistance. Hanson filed a supplement to her resistance to the motion for summary judgment on August 6, 1996, accompanied by a statement of material facts and affidavits. On August 7, 1996, Hanson requested two additional days to file her brief in support of her resistance. That request was reluctantly granted, and Hanson's brief was filed on August 8, 1996.

*Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings. Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[3] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Hanson, and give Hanson the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77

F.3d 1109, 1112 (8th Cir.1996); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir. 1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving parties, here the Hospital defendants, bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The Hospital defendants are not required by Rule 56 to support their motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Hanson is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir. 1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79

---

**3.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Hanson fails to make a sufficient showing of an essential element of a claim with respect to which she has the burden of proof, then the Hospital defendants are "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2509–10; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the undisputed and disputed facts in the case as presented by the record on summary judgment.

### III. FINDINGS OF FACT

#### A. Undisputed Facts

Dianne Hanson began working for the Hospital on July 30, 1982, as a cook in the dietary department. Hanson's employment with the Hospital continued until October 20, 1994, when she was discharged by the Hospital. The parties do not dispute that Hanson was an at-will employee of the Hospital. The parties also agree that the Hospital is a municipal subdivision operating under state law and that it receives funding from Hancock County. Hanson's direct supervisor in the Hospital dietary department was defendant Lyola Tulp, the dietary manager. The Hospital administrator was defendant Lawrence Crail. The other named individual defendants, Clayton Greiman, Dean Cataldo, Dorothy Larson, Lois Schroeder, Patricia DeWaard, Steve Palmer, and Al Denny, were members of the Hospital's Board of Trustees.

It is undisputed that, in the year prior to her discharge, Hanson began receiving below-standard performance evaluations and that, on October 1, 1993, Tulp placed Hanson on what Tulp described as "probation" for three months. This first probation period ended January 1, 1994. Among the criticisms leading to Hanson being placed on probation was Hanson's failure to inform Tulp before scheduling days off and arranging for other employees to cover for her. Tulp made another unfavorable performance evaluation of Hanson at the end of this probation period. Although the disciplinary procedures outlined in the Hospital's employee handbook indicate that an employee could be discharged following a period on probation if performance did not improve, Tulp instead placed Hanson on "probation" for an additional six months. The performance evaluation indicated that if improvements were not made, Tulp would consider other "alternatives." This performance evaluation and Tulp's decision to extend Hanson's probation were discussed with Hanson on February 14, 1994. The second probation period ended August 14, 1994. Hanson's performance evaluation at the end of this second probation period still did not indicate improvement. However, Tulp and Administrator Crail determined that, rather than discharge Hanson at that time or place her on probation for a third time, if Hanson again violated Hospital rules or policy, she would be discharged.

The Hospital's employee handbook, entitled Personnel Policies, provides for notification of an employee's supervisor of any absences as follows: "If you are unable to report for work for any reason, notify your supervisor as soon as you know that you will be unable to report for work so that timely arrangements for a replacement can be made." Defendants' Exhibit I, Personnel Policies, p. 2.8. Hanson had been criticized in performance evaluations for failing to get her supervisor's approval for shift changes and instead arranging them herself. However, it is undisputed that employees in the dietary department sometimes traded shifts, and that Tulp's permission for such trades was not always obtained in advance.

According to her regular work schedule, Hanson had days off on October 20 and 21, 1994. She therefore scheduled a stay at the Hospital for a cancer biopsy those two days. Prior to entering the Hospital, Hanson executed a form request that all information concerning her stay at the Hospital be kept confidential.[4] Hanson also arranged for other employees to cover her shifts on October 22 and 23, 1994, should she be unable to return to work. Hanson did not, however, alter the written work schedule. The two employees who had agreed to cover Hanson's shifts altered the written work schedule to reflect their understanding that they were to work for Hanson.

The focus of this lawsuit is the actions of Lyola Tulp leading to Hanson's termination. At about 6:00 a.m. on October 20, 1994, Tulp reviewed the day's list of patients, which is ordinarily supplied to the dietary manager to determine dietary needs. She recognized Dianne Hanson's name on that list. Tulp sought to verify the identity of the Dianne Hanson on the patient list by contacting the nursing division, and was informed that the person in question was indeed the Dianne Hanson employed in the Hospital dietary department, but that she wanted no visitors. Tulp then checked the dietary department work schedule, and discovered that it had been altered so that other employees were covering Hanson's shifts for October 22 and 23, 1994. Tulp considered this change of Hanson's work schedule without prior authorization from Tulp to be a violation of Hospital policy. Tulp also considered that Hanson had been warned not to make unauthorized changes in her work schedule in the performance evaluations leading to Hanson's placement on probation. Tulp consulted Hospital Administrator Lawrence Crail, who concurred that the failure to obtain authorization for a schedule change was a violation of Hospital policy. Crail and Tulp therefore concluded that Hanson should be discharged for chronic, substandard work performance with the "last straw" being a further incident of revising her work schedule without authorization from her supervisor.

In a letter dated October 21, 1994, Tulp informed Hanson that her employment was terminated effective October 20, 1994. The body of that letter states the following:

I have been informed that you recently had surgery at HCMH and are recuperating at home. I learned of this, not from you, which should have been the case, but from noting your name on the patient dietary records yesterday morning, and inquiring if it was you. I certainly hope your surgery went well, and I want to wish you a speedy recovery.

Dianne, you have been on probation for over nine months for unacceptable behavior patterns, and have repeatedly not responded appropriately to my written and spoken requests for modification of your behavior. You have been very disruptive to the smooth operations of the Dietary Department, and it has been reported to me on several occasions that you have told others—not me—that you hated to come to work. When a person does not like her job, the quality of the work tends to suffer.

This most recent incident, not telling me you were having surgery so I could modify the work schedule, but instead finding your own replacements, is just the last of a long, long history of unacceptable behavior. It appears as though your attitude is

---

4. A copy of such a form has not been submitted as part of the record. However, the Hospital does not deny that Hanson executed such a form, which is apparently a standard part of the paperwork executed by a patient on entering the Hospital.

not going to change, though I have counselled you on frequent occasions. Therefore, with Mr. Crail's agreement, I am herewith terminating your employment at HCMH, effective Thursday, October 20, 1994.

I wish you every success in securing employment in a situation more to your liking.

Defendant's Exhibit H.

Hanson complained about her dismissal first in a telephone call to Crail on October 26, 1994, but he advised Hanson that he supported Tulp's decision to terminate her, and that the Hospital "stood firm" on the termination of her employment. Hanson sought and obtained a "name-clearing" hearing on March 9, 1995, with the Hospital Board of Trustees, at which she again complained about her dismissal and the alleged violation of the privacy of her hospital patient records. However, the Trustees affirmed the dismissal and provided no remedy for any alleged violation of privacy.

Following her termination, Hanson filed a claim for unemployment compensation with the Iowa Department of Job Service. The Hospital opposed that claim, asserting that Hanson had been discharged for misconduct. On November 16, 1994, a Job Service representative determined that Hanson was entitled to unemployment benefits. The Hospital filed a timely appeal, but on January 24, 1995, a Job Service Administrative Law Judge affirmed the representative's determination that Hanson was entitled to benefits. The Hospital sought further review before the Employment Appeal Board on February 7, 1995. Hanson filed her brief on appeal to the Employment Appeal Board, but the Hospital did not. Instead, the Hospital requested that its appeal be dismissed on March 8, 1995.

### B. Disputed Facts

The record reflects that the following facts are in dispute. The question to be addressed below, in the court's legal analysis, is whether these disputes of fact are material under the governing law, such that they preclude summary judgment on any of Hanson's claims. *See, e.g., Fed.R.Civ.P.* 56(c); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–

53; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

First, Hanson disputes the reason for her below-average performance evaluations by defendant Lyola Tulp. Hanson contends that Tulp was her supervisor for approximately six years. However, it was only beginning in 1989, and continuing through 1992, when Hanson began taking courses that would qualify her for Tulp's dietary manager position, that Tulp began to give Hanson unfavorable performance evaluations and began blaming Hanson for things Hanson contends she did not do. Hanson therefore contends that Tulp fabricated the allegedly poor performance reflected in Hanson's performance evaluations. Hanson also contends that she was not put on "probation" as the result of poor performance evaluations in late 1993 and early 1994, because she continued to accrue sick leave and other benefits that she asserts are not available to probationary employees according to Hospital policy as stated on page 1.1 of the Hospital's Personnel Policies.

Hanson contends that Tulp and other Hospital defendants have repeatedly stated that she altered the work schedule for October 22 and 23, 1994, but that it is undisputed that the written work schedule was altered by the employees who had agreed to cover for her, Blanche Chizek and Becky Kofron. Hanson contends that Kofron and Chizek misunderstood the arrangement about working for her, because she had asked them to cover for her only if needed. Apparently, Hanson asserts, Kofron and Chizek incorrectly thought they were supposed to cover the shifts no matter what. Furthermore, Hanson contends that she was able, and intended, to return to work on October 22, 1994, to work her scheduled shift. Therefore, Hanson asserts that she had no obligation to notify Tulp that she anticipated an absence from work on October 22, 1994. Hanson also contends that the Hospital was on notice that a cancer biopsy ordinarily requires only two days of time off, so that the Hospital should have known Hanson would return to work as originally scheduled. However, the record does not reflect that Tulp knew the specific

nature of Hanson's treatment at the Hospital apart from the fact that it was some kind of "surgery." The Hospital contends that whether or not someone else actually physically altered the work schedule, it is undisputed that Hanson arranged substitutes without Tulp's knowledge or permission, which is the essence of the violation of Hospital policy on the basis of which the Hospital terminated Hanson.

Finally, Hanson contends that there is at least a genuine issue of material fact that the Hospital was aware of the stressful nature of Hanson's reason for entering the Hospital. Furthermore, the Hospital's own performance evaluations of Hanson indicate that she does not handle stress on the job well. Thus, Hanson contends that there is a genuine issue of material fact as to whether the Hospital knew its decision to terminate Hanson under the circumstances would inflict serious emotional distress upon a person already in a stressful situation.

## IV. LEGAL ANALYSIS

### (including some further findings of fact)

Although it is the last of the seven claims in the complaint, the court's analysis begins with Hanson's federal claim brought pursuant to 42 U.S.C. § 1983. This course is appropriate, because this federal claim is the basis for this court's jurisdiction. Hanson has asserted that if the court finds summary judgment is appropriate on this federal claim, it should remand the remaining state-law claims to state court. Thus, the disposition of the federal claim may determine whether the court can or should also decide the motion for summary judgment as to any of the state-law claims.

### A. The Federal "Due Process" Claim

Before considering the merits of the motion for summary judgment on the due process claim, the court must first determine precisely what due process claim is at issue. As the court observed in its recitation of the procedural background for this case, the due process claim pleaded in the complaint is that Hanson was deprived of her property right to sick leave benefits without a pre-deprivation hearing. This is the nature of the claim as the Hospital understands it, as reflected in the Hospital's brief in support of its motion for summary judgment. However, in her resistance brief, Hanson appears to assert *two* due process claims. Hanson asserts a property interest not only in her accumulated sick leave, but in her right to privacy. She contends that Crail and Tulp deprived Hanson of her "property" right to privacy without providing any due process, and that the Hospital Trustees also failed to protect this property interest. The court perceives this "due process" claim based on deprivation of Hanson's asserted privacy rights to be an alternative theory for her other privacy rights claims stated in her complaint.

### 1. The due process "privacy" claim

■ In the circumstances of this case, the court will not entertain the due process "privacy" claim, which was never stated in any version of the complaint, but only in plaintiff's brief. Treating the articulation of the new due process claim in plaintiff's brief as a belated request for leave to amend, it is apparent that such a belated amendment should be denied. The Federal Rules of Civil Procedure provide that, except in circumstances not present here, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Fed.R.Civ.P.* 15(a). The Supreme Court has stated that the granting of leave to amend is within the discretion of the district court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). Federal courts have generally and consistently recognized that the rules governing the amendments of pleadings are to be construed liberally. *Standard Title Ins. Co. v. Roberts,* 349 F.2d 613, 622 (8th Cir. 1965). The leave sought should be "freely given" in the absence of any justifiable reason for denial of the motion, such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the defendant or futility of the amendment. *Fo-*

man v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).[5]

In *Humphreys v. Roche Biomedical Labs., Inc.,* 990 F.2d 1078 (8th Cir.1993), the Eighth Circuit Court of Appeals affirmed the district court's refusal to allow a pre-trial motion for leave to amend where the amendment was offered as a change of theory of the case after summary judgment had been granted against the plaintiff and no valid reason was shown for failure to present the new theory at an earlier time. *Humphreys,* 990 F.2d at 1081. Similarly, in *Sorenson v. First Wisconsin Nat'l Bank of Milwaukee,* 931 F.2d 19 (8th Cir.1991), the court refused to allow what it called an "ad hoc assertion" of a new theory of a case after summary judgment in an attempt to create a genuine issue of material fact where none had existed before. *Sorenson,* 931 F.2d at 21. The decision of the Eighth Circuit Court of Appeals most nearly on point procedurally, however, is that relied upon in *Sorenson,* the court's decision in *Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286 (8th Cir.1999). In *Wilson,* the plaintiff filed an affidavit in opposition to the defendant's motion for summary judgment, in which he expanded on his earlier testimony concerning his discharge and created an issue of material fact as to whether the statute of limitations had equitably tolled in his age discrimination suit. *Wilson,* 838 F.2d at 288. The Eighth Circuit Court of Appeals held that this change in the plaintiff's theory was improper, because a party could delay summary judgment by making revisions, and therefore no case would ever be proper for summary judgment. *Id.* at 289. In accord

with the decisions already discussed is that of the Eighth Circuit Court of Appeals in *Missouri Housing Dev. Comm'n v. Brice,* 919 F.2d 1306 (8th Cir.1990), which cited with approval the following:

> [I]f the amendment substantially changes the theory on which the case had been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.

*Brice,* 919 F.2d at 1316 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1488, at 659–62 (2d ed. 1990)).

The Hospital has never acquiesced in the assertion of a non-pleaded claim, as its own brief reflects its understanding that only the "sick leave" due process claim was at issue. Furthermore, the assertion of this alternative "privacy" claim on the eve of trial works a prejudice upon the Hospital, because it would require significant new preparation. *Brice,* 919 F.2d at 1316. It would be improper to allow Hanson to forestall summary judgment by asserting a new theory so close to trial. *Wilson,* 838 F.2d at 289. Hanson has asserted no reason for not bringing such a theory of her privacy claim earlier, *Humphreys,* 990 F.2d at 1081, and indeed has availed herself of other opportunities to attempt to amend the complaint without raising such a theory. Such delays and failure to assert the new theory in prior proffered amendments, coupled with the prejudice entertaining the new theory at this late date would work upon defendant, are sufficient grounds for this

---

5. In interpreting the liberal policy underlying motions to amend pursuant to *Fed.R.Civ.P.* 15(a), the United States Court of Appeals for the Eighth Circuit has used terms nearly identical to those used by the Supreme Court in the *Foman* decision, stating that

> [u]nder this policy, only limited circumstances justify a district court's refusal to grant leave to amend pleadings; undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party.... This court will review the district court's refusal to grant leave to amend under the abuse of discretion standard. *Norbeck v. Davenport Community School District,* 545 F.2d 63, 70 (8th Cir.1976), *cert. denied,* 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977).

*Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir.1987) (citation omitted); *see also Fuller v. Secretary of Defense of U.S.,* 30 F.3d 86, 88 (8th Cir.) ("Leave to amend should be granted absent a good reason for the denial, such as undue delay, bad faith, undue prejudice to the nonmoving party, or futility," citing *Thompson–El v. Jones,* 876 F.2d 66, 67 (8th Cir.1989)), *cert. denied,* —— U.S. ——, 115 S.Ct. 583, 130 L.Ed.2d 497 (1994); *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 225 (8th Cir.1994) ("Good reason to deny leave to amend exists if the amendment would be futile," citing *Foman,* 371 U.S. at 182, 83 S.Ct. at 230, and *Thompson–El,* 876 F.2d at 67); *Costello, Porter, Hill, Heisterkamp & Bushnell v. Providers Fidelity Life Ins. Co.,* 958 F.2d 836, 839 (8th Cir.1992); *Standard Title,* 349 F.2d at 622.

court to deny an implicit or explicit request for leave to assert a new claim. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230. Thus, Hanson's due process claim will be considered here only as pleaded, *i.e.,* as a claim for denial of due process in the deprivation of an alleged property right to accumulated sick leave.

■ In the alternative, assuming that the court should entertain the belated "privacy" due process claim, the court finds that the Hospital is entitled to summary judgment on the claim. Hanson has failed to demonstrate that her right to privacy is a "property" interest entitled to due process protection. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."); *Jennings v. Lombardi,* 70 F.3d 994, 995 (8th Cir.1995) (Fourteenth Amendment prohibits government from depriving any person of property without due process of law, citing *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972)). The court therefore turns to consideration of the due process claim actually pleaded.

### 2. The "sick leave" due process claim

■ The only due process claim, and hence the only federal claim, in this litigation is Hanson's claim that she was deprived of her property right to sick leave benefits without a pre-deprivation hearing. The court notes that due process claims are generally subjected to a two-part analysis: (1) is the asserted interest protected by the due process clause; and (2) if so, what process is due. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982); *Sanders v. Woodruff,* 908 F.2d 310, 312 (8th Cir.), *cert. denied sub nom. Herron v. Woodruff,* 498 U.S. 987, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990); *Tyler v. Black,* 811 F.2d 424, 427 (8th Cir.1987), *adopted in relevant part,* 865 F.2d 181 (8th Cir.1987) *(en banc), cert. denied,* 490 U.S. 1027, 109 S.Ct. 1760, 104 L.Ed.2d 196 (1989); *see also Youakim v. McDonald,* 71 F.3d

1274, 1288 (7th Cir.) (two-step analysis of due process claim, citing *Logan*), *cert. denied,* ―― U.S. ――, 116 S.Ct. 2571, 135 L.Ed.2d 1087 (1996). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court wrote, "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews,* 424 U.S. at 332, 96 S.Ct. at 901; *Jennings,* 70 F.3d at 995 (8th Cir.1995); *Demming v. Housing and Redev. Auth.,* 66 F.3d 950, 953 (8th Cir.1995) (quoting *Mathews*). The possession of a protected life, liberty, or property interest is thus a "condition precedent" to the government's obligation to provide due process of law, and where no such interest exists, there is no due process violation. *Movers Warehouse, Inc. v. City of Little Canada,* 71 F.3d 716, 718 (8th Cir.1995); *Zenco Dev. Corp. v. City of Overland,* 843 F.2d 1117, 1118 (8th Cir.1988) ("A discussion of whether a party has a right to procedural due process must start with the question of whether the party has a property interest in the thing taken away.").

■ Protected interests "are created and their dimensions are defined" not by the Constitution but by an independent source, such as state or federal law. *Movers Warehouse,* 71 F.3d at 718 (citing *Craft v. Wipf,* 836 F.2d 412, 416 (8th Cir.1987)); *Zenco Dev. Corp.,* 843 F.2d at 1118. When the assertedly protected interest is a grant of a benefit or privilege from the government, a person "must have more than a unilateral expectation of it. He [or she] must, instead, have a legitimate claim of entitlement to it." *Id.* (again citing *Craft,* which in turn quotes *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Zenco Dev. Corp.,* 843 F.2d at 1118 (also quoting *Roth* ). The court will pass, at least for now, on the question of whether Hanson's sick leave benefits are such a property right, to consider instead the second step of the due process analysis.

■ The next step in the due process analysis is to ask what process is due in the present instance, *Sanders,* 908 F.2d at 312, or, to put it another way, what process is due

in light of "the practicalities and peculiarities of the case"? *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *see also Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (due process is a "flexible concept"; its protections vary according to the demands of a particular set of circumstances); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Griffin–El v. Delo,* 34 F.3d 602, 605 (8th Cir.1994) (the extent of due process required depends upon particular interests affected, citing *Mathews,* 424 U.S. at 332–35, 96 S.Ct. at 901–03); *Birdsell v. Board of Fire and Police Comm'rs,* 854 F.2d 204, 207–09 (7th Cir.1988). In general, due process requires that a hearing before an impartial decisionmaker be provided at a meaningful time, and in a meaningful manner. *Coleman v. Watt,* 40 F.3d 255, 260 (8th Cir.1994) (citing *Mathews,* 424 U.S. at 332, 96 S.Ct. at 901).

▪ However, although a state must generally provide due process *before* depriving a citizen of property, when pre-deprivation process is impractical or impossible, the availability of some meaningful post-deprivation remedy satisfies due process. *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). Furthermore, a due process claim lacks merit where there exists an adequate state court remedy. *Zakrzewski v. Fox,* 87 F.3d 1011, 1014 (8th Cir.1996) (citing *Parratt,* and finding adequate state court remedy precluding § 1983 due process claim under a state statute providing for enforcement of visitation orders). This doctrine applies to deprivations of property or liberty. *Zakrzewski,* 87 F.3d at 1014; *Williams–El v. Johnson,* 872 F.2d 224, 224 (8th Cir.), *cert. denied,* 493 U.S. 871, 110 S.Ct. 199, 107 L.Ed.2d 153 (1989); *Birkenholz v. Sluyter,* 857 F.2d 1214, 1217 (8th Cir.1988). However, the availability of state law post-deprivation remedies is relevant "*only* where the challenged acts of state officials can be char-

acterized as random and unauthorized." *Coleman,* 40 F.3d at 262 (citing *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916; *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3207–08, 82 L.Ed.2d 393 (1984); emphasis in the original).[6]

The discharge of an at-will employee resulting in the loss of accumulated sick leave is not such that the state can predict when the loss of sick leave will occur and the discharge of such an employee is not the result of an established state procedure. It is instead the result of a random and unauthorized, and assertedly intentional, act by state employees, Tulp and Crail. *Coleman,* 40 F.3d at 262. Therefore, this is a situation in which state post-deprivation remedies must be deemed to bar Hanson's due process claim, if such remedies are adequate. *Zakrzewski,* 87 F.3d at 1014. Adequate state-law remedies for Hanson's claim do indeed exist. Hanson may pursue a claim for accumulated sick leave pursuant to the Iowa Wage Payment Collection Act, Iowa Code Ch. 91A. Thus, her due process claim fails. Defendants are entitled to summary judgment on Hanson's only federal claim.

### B. Disposition Of State–Law Claims

#### 1. Absence of a federal claim

▪ Hanson contends that if summary judgment is appropriate on her only federal claim, the court must remand the state-law claims to state court for adjudication, rather than proceed to disposition of those claims either on summary judgment or at trial. The rule Hanson asserts, however, is not the law.

The rule is instead that a federal district court has *discretion* to dismiss without prejudice state law claims remaining before the court after the court has dismissed all claims over which it has original jurisdiction. *See, e.g.,* 28 U.S.C. § 1367(c)(3) ("the district court *may* decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction...."; emphasis added); *Labickas v. Arkansas State Univ.,* 78 F.3d 333, 334 (8th

---

6. Any substantive due process claim based on the same random and unauthorized acts should also

be barred. *Weimer v. Amen,* 870 F.2d 1400, 1406 (8th Cir.1989).

Cir.1996) (it is within the district court's discretion to dismiss state-law claims once summary judgment or dismissal has been granted on all federal claims, but dismissal should be without prejudice); *McLaurin v. Prater,* 30 F.3d 982, 985 (8th Cir.1994) (28 U.S.C. § 1367(c) provides the district court with discretion to reject jurisdiction over supplemental claims, but only if they fall within one of the instances stated).

Some time ago, the Eighth Circuit Court of Appeals identified factors the district court should consider in deciding whether, upon dismissal or summary judgment on a federal claim, it should, in its discretion, dismiss the remaining state-law claims. *Koke v. Stifel, Nicolaus & Co., Inc.,* 620 F.2d 1340, 1346 (8th Cir.1980). Those factors include "the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum." *Koke,* 620 F.2d at 1346. The court finds this specification of considerations no less applicable to discretionary supplemental jurisdiction under 28 U.S.C. § 1367 than it was prior to enactment of that statute in 1990. *Compare Willman v. Heartland Hosp. East,* 34 F.3d 605, 613–14 (8th Cir.1994) (citing same factors stated in *Koke,* but affirming remand of the case, because exercise of pendent jurisdiction is discretionary when the case falls within § 1367(c)(3), and the matter may be remanded even after the parties have completed a lengthy and complex discovery process and the court has disposed of a motion for summary judgment just weeks before trial, citing *Marshall v. Green Giant Co.,* 942 F.2d 539, 549 (8th Cir.1991)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *with Mizuna, Ltd. v. Crossland Fed. Sav. Bank,* 90 F.3d 650, 657 (2d Cir.1996) (also applying factors similar to those stated in *Koke,* but finding that when the federal claim was dismissed, the district court had discretion under § 1367(c)(3) to remand the case to state court, and had properly retained the

case in consideration that "three judicial officers had already expended substantial resources on the case over a year's time, and an order had issued that contemplated an imminent resolution; in addition, returning the case to state court would facilitate Mizuna's fairly bald effort to avoid an unfavorable outcome that the court had already foreshadowed, and would be grossly unfair to Royal.").

Applying the *Koke* factors, therefore, the court concludes that the state claims are not particularly unusual or complicated, and this court has invested significant time and energy, as have the parties, in bringing this matter to the summary judgment stage and trial readiness. *Koke,* 620 F.2d at 1346. These factors weigh in favor of keeping any remaining state-law claims in federal court. Although the court will necessarily have to invest further energy in consideration of the motion for summary judgment on the remaining state-law claims, and yet more if the matter proceeds to trial, which might weigh in favor of remand to state court, it is readily apparent that the imminent trial date in federal court, and hence imminent resolution of a controversy almost two years old, is unlikely to be matched in a state forum. Thus, on balance, the court will, in its discretion, maintain jurisdiction over the remaining state-law claims, both to render a ruling on the Hospital's summary judgment motion and, if necessary, through trial.

The court therefore turns to consideration of the Hospital's motion for summary judgment on each of Hanson's state-law claims in turn.

### 2. *Invasion of privacy*

The first of Hanson's state-law claims is a claim for invasion of privacy. The Iowa Supreme Court first recognized the tort of invasion of privacy in *Bremmer v. Journal–Tribune Publishing Co.,* 247 Iowa 817, 821–22, 76 N.W.2d 762,. 764–65 (1956).[7] *Stessman v. Am. Black Hawk Broadcasting Co.,* 416

---

7. Although Hanson asserts four sources for her right to privacy, Iowa common law, Iowa Code § 22.7(2) & (11), the confidentiality request she signed upon entering the Hospital, which she describes as a "contract right" of privacy, and

the Hospital employee's manual, which advises employees of the obligation to maintain the privacy of patients, Hanson has not asserted that her claim is anything but the tort cause of action recognized by the Iowa Supreme Court.

N.W.2d 685, 686 (Iowa 1987); *Howard v. Des Moines Register & Tribune Co.*, 283 N.W.2d 289, 291 (Iowa 1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980); *Winegard v. Larsen*, 260 N.W.2d 816, 818 (Iowa 1977). In *Bremmer*, the tort was defined as invasion of "the right of an individual to be let alone, to live a life of seclusion, to be free from unwarranted publicity." *Bremmer*, 247 Iowa at 821, 76 N.W.2d at 764. Since the recognition of the tort in *Bremmer*, the Iowa Supreme Court has adopted and applied the principles of invasion of privacy articulated in the Restatement (Second) of Torts (1977). *Stessman*, 416 N.W.2d at 686; *Lamberto v. Bown*, 326 N.W.2d 305, 309 (Iowa 1982); *Anderson v. Low Rent Housing Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981); *Howard*, 283 N.W.2d at 291; *Winegard*, 260 N.W.2d at 822 (first applying those principles).

The Restatement principles the Iowa Supreme Court has adopted are found in § 652A and subsequent sections defining each form of the tort. Section 652A states as follows:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name, or likeness, as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

*Winegard*, 260 N.W.2d at 822 (also stating that these four forms of invasion of privacy were cited in *Yoder v. Smith*, 253 Iowa 505, 508, 112 N.W.2d 862, 863–64 (Iowa 1962)). The court in *Winegard* clarified the requirements of each of these forms of the tort. *Id.*

#### a. Forms of the tort asserted here

 The first form of the tort in question here, intrusion upon seclusion, was defined in *Winegard* as follows:

Category (a) requires an intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person. § 652B.

*Id.*[8] The court noted further that both categories (c) and (d) of the tort require publicity

---

**8.** Comments to the Restatement (Second) of Torts § 652B further clarify this formulation of the tort:

 *a.* The form of invasion of publicity covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable [person].

 *b.* The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objections in entering his home. It may also be by use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping telephone wires. *It may be by some other form of investigation or examination into his private concerns, as by opening his private mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.*

The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of photograph or information outlined. . . .

 *c.* The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters. . . .

 *d.* There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable

or publication of some sort, and that the latter category overlaps the law of defamation. *Id.* at 823; *see also Anderson,* 304 N.W.2d at 248 (Category (d) "false light" theory of the tort, stating that although untruthfulness is required, it is not necessary for the plaintiff to prove that he or she was defamed); *Howard,* 283 N.W.2d at 298 (Category (c) publicity theory of invasion of privacy).[9] Category (a) of the tort, however, does not require publication. *Lamberto,* 326 N.W.2d at 309; *Winegard, 260 N.W.2d at 822; Restatement (Second) of Torts § 652B, comment a.*

To recover under the intrusion upon seclusion theory of the tort,

> a plaintiff must show, first, that the defendant intentionally intruded upon the seclusion that the plaintiff "has thrown about [his or her] person or affairs." Restatement § 652B comment c; *accord Winegard,* 260 N.W.2d at 822. Second, the intrusion must be one that would be "highly offensive to a reasonable person." *Winegard,* 260 N.W.2d at 822; *accord* Restatement § 652B. The defendant is not liable, however, if the plaintiff is already in public view. Restatement § 652B comment c.

*Stessman,* 416 N.W.2d at 687. The Iowa courts have made no other-articulation of the elements of the intrusion on seclusion theory of the tort, and, more importantly here, have not specified the degree of injury necessary to recover on the tort.

Hanson also contends that she has asserted the third form of the tort as described in Restatement (Second) of Torts § 652A(2)(c), unreasonable publicity, as further described in § 652D. This form of the tort was discussed in *Howard v. Des Moines Register & Tribune Co.,* 283 N.W.2d 289 (Iowa 1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), again relying on the Restatement formulation for its articulation of the elements of the tort:

This theory of invasion of privacy is defined in *Restatement* section 652D:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

*Howard,* 283 N.W.2d at 291; *Winegard,* 260 N.W.2d at 823. Hanson asserts that it is undisputed that Lyola Tulp gave "publicity" to the matters on which Hanson had requested absolute confidentiality, because Tulp "made known" to employees of the Hospital that Hanson was staying in the Hospital, and, as a consequence of that "publicity," the employees sent Hanson flowers.

### b. *Disposition of Hanson's invasion of privacy claims*

■ The court finds that, despite genuine issues of material fact on the first element of Hanson's first claim of invasion of privacy, "intrusion on seclusion" as described in § 652B of the Restatement, her failure to generate a genuine issue of material fact as to the second element of this claim is fatal. As to the first element of the claim, that the defendant intentionally intruded upon the seclusion that the plaintiff "ha[d] thrown about [his or her] person or affairs," *Stessman,* 416 N.W.2d at 687; *Winegard,* 260 N.W.2d at 822; Restatement § 652B comment c, a reasonable inference from the record is that Tulp intentionally sought information from the nursing division concerning the identity of the Dianne Hanson who appeared on her patient list. Hanson's assertion that she made a specific request for confidentiality during her hospital stay at least demonstrates a genuine issue of material fact that she had raised about her a curtain of seclu-

---

man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the

plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.... (emphasis added.).

9. Restatement (Second) of Torts § 652A, comment d, recognizes that the various forms of invasion may also overlap.

sion concerning her identity as a patient of the Hospital that she did not want violated.

However, Hanson's claim founders as to the second element, that the intrusion must be one that would be "highly offensive to a reasonable person." *Stessman,* 416 N.W.2d at 687; *Winegard,* 260 N.W.2d at 822; Restatement § 652B. It is possible that Tulp could not have obtained verification of Hanson's identity had she not been a Hospital employee. However, it is the fact that Tulp *was* a supervisory employee of the Hospital, coupled with the limited nature of her inquiry, that take her inquiry and the disclosure to her out of the "highly offensive" category. Although both a statute, Iowa Code § 22.7, and a Hospital policy affirm the confidentiality of patient records, both reasonably relate only to disclosures to outsiders. Although it might be highly offensive for the Hospital to disclose the identity of a patient to a member of the general public who happened to be the patient's employer, it is not reasonable to suppose that requests for information, even information confidential as to outsiders, by persons on the staff of the Hospital, or disclosures to such persons, would be equally offensive. Employees of the Hospital reasonably come *within* the curtain of seclusion, not *without* it.

The limited offensiveness here is also a result of the limited nature of the inquiry, which was only for verification of identity, not some intimate detail of ailment, condition, or treatment. It is possible that, had Tulp accessed confidential files not normally open to her, or had she made inquiries into the nature of Hanson's ailment, medical treatment, medical history, pharmacy or medication records, radiological or biopsy reports, or prognosis, or had she contacted treating physicians, or, indeed, had she asserted a right to visit Hanson because she was a member of the Hospital staff despite being advised that Hanson wanted no visitors, a reasonable person could find a highly offensive intrusion upon seclusion, even if such inquiries were made by a member of the Hospital staff. However, the request for information concerning the identity of a patient by a Hospital department supervisor, Tulp, and the disclosure of that information to the department supervisor do not raise the inference that a reasonable person would find either the request or disclosure to be "highly offensive." The Hospital is therefore entitled to summary judgment on this "privacy" claim.

■ As to Hanson's "privacy" claim based on §§ 652A(2)(c) and 652D of the Restatement, the claim alleging "unreasonable publicity," the court finds that Hanson has failed to generate a genuine issue of material fact that any "publicity" occurred that is sufficient to bring Tulp's conduct within § 652D. Hanson has mistaken "publicity" for "publication," which is precisely the distinction made in the comments to this formulation of the tort in § 652D of the Restatement. Thus, comment *a* provides as follows:

The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. *"Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by other means. It is one of a communication that reaches, or is sure to reach, the public.*

*Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.* On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in

other words, is one between private and public communication. Restatement (Second) of Torts § 652D, comment *a* (emphasis added). Hanson has not alleged "publicity" at all in her complaint, nor for that matter in her brief, but only communication to a small group. Nor has she pointed to any part of the record demonstrating that the Hospital employees who learned of her stay, or the Hospital employees altogether, are so numerous that Tulp's communication to them, assuming it occurred, would constitute "publicity." Restatement (Second) of Torts § 652D, comment *a*. This failure to designate support for the claim in the record is fatal. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Any claim under § 652D of the Restatement therefore fails as a matter of law. Because no genuine issue of material fact precludes summary judgment on either of the theories of an invasion of privacy Hanson has asserted, the Hospital is entitled to summary judgment on Hanson's "invasion of privacy" claim in Count I.

### 3. Conversion of "property" interest in privacy

█ In Count II of her complaint, Hanson alleges that the defendants converted hospital patient information for their own use, and she seeks damages in the amount of $272,380.00 as the value of the converted "property" right to privacy. Although the Hospital has not distinguished its challenge to the first of Hanson's "privacy" claims from its challenge to the "conversion" claim alleging conversion of the privacy right, it appears that the Hospital's ground for summary judgment on the "conversion" claim is that the information upon which Tulp and Crail relied in firing Hanson was already available to them as employees of the Hospital. However, the court found above that there was at least a genuine issue of material fact that Tulp could not have obtained the confirmation of Hanson's identity as the patient in the Hospital but for her position as an employee

of the Hospital, yet Tulp had no need for such information to see to the dietary needs of the patient named Dianne Hanson. Nonetheless, this issue of fact does not preclude summary judgment on this claim, because the court finds no *legal* basis for such a claim.

### a. The "conversion" cause of action under Iowa law

█ In her resistance to the motion for summary judgment, Hanson has clarified that her "conversion" claim is a claim pursuant to Restatement (Second) of Torts § 222A.[10] Under Iowa law, which is based on Restatement (Second) of Torts § 222A, "[c]onversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Ezzone v. Riccardi,* 525 N.W.2d 388, 396 (Iowa 1994) (citing *Kendall/Hunt Pub. Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988), and Restatement (Second) of Torts § 222A(1), at 431 (1965)), *cert. denied sub nom. Ezzone v. Hansen,* — U.S. —, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995); *McCray v. Carstensen,* 492 N.W.2d 444, 445 (Iowa Ct.App.1992) (also citing *Kendall/Hunt* ); *Larson v. Great West Cas. Co.,* 482 N.W.2d 170, 173 (Iowa Ct.App. 1992) (also citing *Kendall/Hunt,* but not § 222A of the Restatement). Thus, no conversion may be found where the exercise of control was not wrongful. *Larson,* 482 N.W.2d at 173 (citing *Williams v. Redinger,* 179 Iowa 615, 616, 161 N.W. 701, 702 (1917)). Furthermore, liability for conversion may only be imposed when the intentional and wrongful interference with the property is so serious that the actor may justly be required to pay full value. *Kendall/Hunt,* 424 N.W.2d at 247; *McCray,* 492 N.W.2d at 445; *Larson,* 482 N.W.2d at 174. Citing § 222A of the Restatement, Iowa courts list the following factors as appropriate to consider whether the interference is sufficiently serious to find a conversion:

---

10. The court does not find this to be a "new theory" of the claim, but a clarification of the legal basis for the claim that is consistent with the allegations of the claim in the complaint.

Thus, this clarification does not run afoul of the same impediments as Hanson's unforeseen due process claim based on a "privacy" interest.

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Kendall/Hunt,* 424 N.W.2d at 247; *McCray,* 492 N.W.2d at 445; *Larson,* 482 N.W.2d at 174.

#### b. *"Conversion" of "intangible" interests*

Hanson asserts that under the "modern" view, conversion can apply to "intangible property," citing *United States v. May,* 625 F.2d 186 (8th Cir.1980). However, the statement actually made in *May* is as follows:

At common law, only chattels or tangible property were subject to the tort of conversion. *See* Restatement (Second) of Torts § 222A (1965). In modern tort law, this rule has been relaxed somewhat in favor of the "reasonable proposition that *any intangible generally protected as personal property may be the subject * * * [of] conversion."* *Pearson v. Dodd,* 410 F.2d 701, 707 n. 34 (D.C.Cir.), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969).

*May,* 625 F.2d at 190 (emphasis added). Hanson fails to adduce any authority whatsoever that her privacy interest is in fact "generally protected as personal property" at all. To the contrary, recent decisions demonstrate the narrowness of the "intangibles" included within the scope of a conversion claim. *Hurst v. Dezer/Reyes Corp.,* 82 F.3d 232, 235–36 (8th Cir.1996) (under New York law of conversion, which is also based on Restatement (Second) of Torts § 222A, "[e]ven under an expanded definition of the tort, conversion is limited to those intangible property rights customarily merged in, or identified with, some document," citing *Ippolito v. Lennon,* 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1989), and Restatement (Second) of Torts § 242); *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1547 (under Minnesota law, conversion generally applies only to tangible property, "or intangible property customarily merged in, or identified with, some document," citing Prosser & Ketton on Torts, 91–92 (1984), and Restatement (Second) of Torts §§ 222A, 242 (1965)). The privacy interest here, even assuming it could be a "property" right, is not one "customarily merged in, or identified with, some document." *Id.* Thus, Hanson has failed to demonstrate, as a matter of law, that a privacy interest is a "property" interest, or, if it could otherwise be a property interest, that it is one of the narrowly defined "intangible" property interests to which a conversion claim could apply. The Hospital is entitled as a matter of law to summary judgment on Hanson's conversion claim as stated in Count II of her complaint.

#### 4. *Intentional infliction of emotional distress*

In Count III of her complaint, Hanson asserts a claim of intentional infliction of emotional distress. Specifically, Hanson asserts that the Hospital acted outrageously in making public information concerning Hanson's stay in the Hospital after she requested absolute confidentiality and in using the confidential information for the purposes of firing her rather than for her medical treatment. The court finds that the Hospital has misconstrued the claim as an assertion that its discharge of Hanson was outrageous, when, in fact, it is the alleged invasion of privacy, on the one hand, or use of the improperly acquired information *for the purpose of firing Hanson,* instead of for her treatment as a patient, on the other, that is the allegation of outrageous conduct. Thus, the Hospital's assertion that Tulp's termination of Hanson cannot be outrageous where it had a "reasonable basis" is wide of the mark. However, more persuasive is the Hospital's assertion that it is entitled to summary judgment, because Hanson has failed to allege or produce any evidence of serious physical symptoms of distress or of a notably distressful mental reaction caused by the allegedly outrageous conduct.

### a. Elements of the tort

██ This court has recently considered the elements of an intentional infliction of emotional distress cause of action under Iowa law on a number of occasions. *See, e.g., Reedy v. White Consol. Indus., Inc.,* 890 F.Supp. 1417, 1440–45 (N.D.Iowa 1995); *Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097, 1122–24 (N.D.Iowa 1994); *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1438–41 (N.D.Iowa 1994), *aff'd,* 61 F.3d 908 (8th Cir.1995) (table decision). More recent decisions of the Iowa appellate courts do not disclose explanations of the tort different from those stated by this court. *See Van Baale v. City of Des Moines,* 550 N.W.2d 153, 156 (Iowa 1996); *Taggart v. Drake Univ.,* 549 N.W.2d 796, 802 (Iowa 1996); *Dickerson v. Mertz,* 547 N.W.2d 208, 214 (Iowa 1996); *Lamb v. Newton–Livingston, Inc.,* 551 N.W.2d 333, 338 (Iowa Ct.App. 1996); *Suntken v. Den Ouden,* 548 N.W.2d 164, 168 (Iowa Ct.App.1996); *Slaymaker v. Archer–Daniels–Midland Co.,* 540 N.W.2d 459, 461 (Iowa Ct.App.1995) (identifying the elements and sustaining grant of summary judgment in favor of defendant).

The elements for recovery on the common law tort of intentional infliction of emotional distress in Iowa are the following:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

(4) actual and proximate cause of the emotional distress by the defendant's conduct.

*Reedy,* 890 F.Supp. at 1440–41 (quoting *Millington v. Kuba,* 532 N.W.2d 787, 793 (Iowa 1995), and citing other cases so identifying the elements of the tort); *see also Van Baale,* 550 N.W.2d at 156; *Taggart,* 549 N.W.2d at 802; *Dickerson,* 547 N.W.2d at 214; *Lamb,* 551 N.W.2d at 338; *Suntken,* 548 N.W.2d at 168.

### b. Outrageousness

██ As this court indicated in *Reedy,* "'It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'" *Id.* at 1441 (quoting *Marks v. Estate of Hartgerink,* 528 N.W.2d 539, 546 (Iowa 1995)); *Dickerson,* 547 N.W.2d at 214 (also citing *Marks* ). The allegation of outrageousness requires an extreme of egregiousness. *Van Baale,* 550 N.W.2d at 155 ("To satisfy the first element a defendant's conduct must be extremely egregious."); *Taggart,* 549 N.W.2d at 802 (same). In other words, the conduct complained of must be "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Reedy,* 890 F.Supp. at 1441 (again quoting *Marks,* 528 N.W.2d at 546, in turn quoting *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 118 (Iowa 1984)); *see also Dickerson,* 547 N.W.2d at 214; *Suntken,* 548 N.W.2d at 168. Thus, the Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 198 (Iowa 1985). Indeed, the Iowa court has said that

[t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra.* "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).

*Northrup,* 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger,* 241 N.W.2d 911, 918 (Iowa 1976)). Peculiar susceptibility, by reason of

physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991) (quoting Restatement (Second) of Torts § 46, comment f). In *Northrup,* the court quoted extensively from the Restatement (Second) of Torts § 46, comment d, for a statement of the level of bad conduct necessary to be held to be outrageous:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup,* 372 N.W.2d at 198; *see also Van Baale,* 550 N.W.2d at 156 (quoting Restatement (Second) of Torts § 46, comment *d*); *Marks,* 528 N.W.2d at 546 (quoting similar passages from *Vinson,* 360 N.W.2d at 118); *Suntken,* 548 N.W.2d at 168 (same, citing *Harsha,* 346 N.W.2d at 801, and *Vinson,* 360 N.W.2d at 118). Iowa courts have held, as the Restatement suggests, that it is not even sufficient that the conduct in question would have entitled the plaintiff to punitive damages. *Mills v. Guthrie County Rural Elec. Coop. Ass'n,* 454 N.W.2d 846, 850 (Iowa 1990) (citing *Vinson,* 360 N.W.2d at 118). In *Marks,* the court observed that allegedly outrageous conduct by persons not defendants in the lawsuit in which the outrage claim is asserted is irrelevant. *Marks,* 528 N.W.2d at 547.

It is a simpler matter to discover what kinds of behavior the Iowa Supreme Court has held insufficiently outrageous to sustain the tort than it is to find out what kind of behavior is sufficiently egregious. *See, e.g., Van Baale,* 550 N.W.2d at 156 (firing police officer after assuring him he would not be fired if he pleaded guilty to charges was not sufficiently outrageous); *Taggart,* 549 N.W.2d at 802 (dean's yelling sexist and condescending comments at professor and accusing her of causing trouble, and otherwise verbally berating her, even if threatening, did not constitute outrageous conduct); *Dickerson,* 547 N.W.2d at 214 (issuing two citations for violation of hunting laws of which defendant was acquitted, confiscating and refusing to return invalid hunting license, repeated and rude checks of plaintiff's hunting license, and refusal to allow plaintiff to keep a road-killed deer were not sufficiently outrageous); *Marks,* 528 N.W.2d at 546–47 (allegedly defamatory comments, writings, and statements leading to loss of church membership not sufficiently outrageous to sustain the tort); *Cutler,* 473 N.W.2d at 183 (letter advising partner who had suffered from a period of mental illness that he could not return to law practice without further review by partners was not extremely outrageous and did not generate a genuine issue of material fact on the claim); *Engstrom v. State,* 461 N.W.2d 309, 320 (Iowa 1990) (negligent failure to search for plaintiffs' adopted daughter's natural father before placing her in plaintiffs' home, and telling adoptive parents the father was dead without verifying his death, were not outrageous); *Kirk v. Farm & City Ins. Co.,* 457 N.W.2d 906, 911 (Iowa 1990) (insurance company's refusal to pay the full amount of uninsured coverage not outrageous); *Mills,* 454 N.W.2d at 849 (rural electric cooperative's conduct in using split bolt connectors instead of compression connectors to connect grounding jumper wire to main neutral line, in failing to discover dangerous situation that such omission presented, and in conducting settlement negotiations through insurance carrier with cooperative customers who sustained fire damage was not sufficiently outrageous); *Tomash v. John Deere Indus. Equip. Co.,* 399 N.W.2d 387, 392–93 (Iowa 1987) (bringing of criminal charges was reasonably appropriate and therefore not outrageous); *Reihmann v.*

*Foerstner,* 375 N.W.2d 677, 681 (Iowa 1985) (claim of improperly exerting influence to transfer employee was too speculative, and transfer of employee after complaints from customers was not outrageous); *Northrup,* 372 N.W.2d at 198–99 (firing for alcoholism not outrageous in light of extensive responsibilities of plaintiff); *Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 777 (Iowa 1985) (bank's refusal to pay own cashier's check not outrageous); *Vinson,* 360 N.W.2d at 119 (deliberate campaign to badger and harass employee not outrageous although "petty and wrong, even malicious"); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (banker's refusal to extend credit causing creditor to default on other obligations not sufficiently outrageous to support jury verdict on emotional distress claim); *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983) (offer to marry made to woman still married and intended for her was not outrageous conduct as to woman's husband, even if it showed poor judgment); *Action Real Estate Corp. v. Bulechek,* 309 N.W.2d 502, 505 (Iowa 1981) (refusal to pay commission on sale of land not outrageous); *Amsden v. Grinnell Mut. Reinsurance Co.,* 203 N.W.2d 252, 255 (Iowa 1972) (refusal to pay fire insurance benefits during period of arson investigation to insured suspected of arson by authorities not outrageous). Few cases can be located where an Iowa court actually held the conduct alleged was sufficiently outrageous. *See, e.g., Blong v. Snyder,* 361 N.W.2d 312, 315–17 (Iowa App.1984) (supervisors' excessive and groundless harassment of employee sufficiently outrageous); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 907–08 (Iowa App.1982) (defective construction of home and filing of mechanic's lien so shocking as to support jury verdict for emotional distress).

Although the court itself considers that Tulp's efforts to pierce the veil of patient confidentiality by trading on her position as a Hospital employee to obtain information that would not, in all likelihood, have been released to a member of the general public making similar inquiries, was "wrong" in an abstract sense, the court has concluded that it was not "highly offensive." The court therefore finds, as a matter of law, that this conduct does not sink to the low of egregiousness required by the Iowa Supreme Court to sustain a claim of intentional infliction of emotional distress. Similarly, the court believes that use of confidential patient information *for the purpose* of firing an employee would also be "wrong," although the court is not convinced that Hanson could make a showing that Tulp or Crail actually used any patient information in deciding to fire Hanson. However, assuming that they did so, in light of the fact that the information in question was only a verification of identity matching information already available to them in the regular course of their duties, the court again concludes that this conduct was not sufficiently outrageous as a matter of law. Furthermore, the court finds another element of the tort is also dispositive of the claim here.

### c. Emotional distress

 The Iowa Supreme Court has established stringent standards for this element of the tort as well. In Iowa, "the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Tappe v. Iowa Methodist Medical Ctr.,* 477 N.W.2d 396, 404 (Iowa 1991) (quoting *Bethards v. Shivvers, Inc.,* 355 N.W.2d 39, 44 (Iowa 1984), in turn quoting Restatement (Second) of Torts § 46, comment j (1965)). The plaintiff must prove more than the fact that he or she felt bad for a period of time. *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 636 (Iowa 1990); *Steckelberg v. Randolph,* 448 N.W.2d 458, 461 (Iowa 1989); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 908 (Iowa App.1982). Rather, the plaintiff must also put on proof of physical ailments that plagued him or her during the relevant period of time and medical evidence of the cause of these ailments. *Vaughn,* 459 N.W.2d at 636. In many cases where the Iowa Supreme Court has held that a fact question was engendered on the issue of emotional harm and causation, the court has relied on the testimony of physicians and psychiatrists. *Id.* (citing cases). Ordinarily, where the plaintiff can sustain no claim of physical injury, she cannot recover on a claim of intentional infliction of emotional distress. *Lamb,* 551 N.W.2d at 339. The situation

here does not fall within any exception to that rule. *Id.*

The Iowa Supreme Court has found a variety of symptoms and combination of symptoms inadequate to support a claim of emotional distress. *See, e.g., Tappe,* 477 N.W.2d at 404 (event "worst thing" that ever happened to plaintiff, followed by symptoms of feeling upset and confused fell far short of proof necessary to sustain a prima facie case); *Vaughn,* 459 N.W.2d at 636 (evidence that plaintiff was upset, grouchy, nervous, and that his sex life deteriorated not sufficient); *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 261 (Iowa 1991) (evidence that plaintiff was so angry he felt physical pain, was sleepless, could only think about the event, felt cheated by the legal system and did not trust lawyers or anyone else, was haunted by fears that occupied his waking moments, interrupted his sleep, and prevented him from enjoying life was insufficient); *Bethards v. Shivvers, Inc.,* 355 N.W.2d 39, 44–45 (Iowa 1984) (one plaintiff "quivered" when the subject came up, the other worried about what other people thought, but such evidence was insufficient); *Harsha,* 346 N.W.2d at 801 (plaintiff was depressed, not interested in life, and downhearted, but such evidence was insufficient); *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981) (plaintiff's evidence that he was "very, very down," felt "super badly," was disappointed, and believed he had lost everything for a month or two was insufficient).

In contrast, cases in which the Iowa courts have found evidence of sufficient emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct. *Steckelberg,* 448 N.W.2d at 462 (citing the following cases: *Meyer,* 241 N.W.2d at 915–16 (plaintiff was nauseous, had difficulty breathing, and was hospitalized for acute heart spasm); *Northrup,* 204 N.W.2d at 855 (plaintiff cried frequently, lost weight, and suffered abdominal cramps); *Randa,* 325 N.W.2d at 908 (plaintiff was hospitalized with a near nervous breakdown, fear, and shock)); *see also Wambsgans v. Price,* 274 N.W.2d 362, 366 (Iowa 1976) (although Supreme Court believed evidence of distress from loss of home was sufficient, jury had been improperly instructed, and matter was remanded).

Review of the record indicates that, assuming the allegedly outrageous conduct to be the cause, Hanson suffered no more than extended periods of crying. There is no medical evidence in the record of physical ailments or causation from which an inference of severe emotional distress could arise in this case. *Vaughn,* 459 N.W.2d at 636. In light of the cases cited above, demonstrating the Iowa Supreme Court's stringent requirements for a showing of emotional distress, and Hanson's failure to designate portions of the record suggesting an inference of sufficient emotional distress, *Fed.R.Civ.P.* 56(e), the court finds that summary judgment should be granted in the Hospital's favor on this claim as well.

### 5. Discharge in violation of public policy

■ In Count IV of her complaint, Hanson asserts a claim for wrongful discharge in violation of public policy. Hanson alleges that her termination was motivated by the Hospital's belief that Hanson would make a claim for sick leave benefits and by her efforts to maintain her right to confidentiality of her hospitalization. This court is also familiar with such claims. *See, e.g., Hanna v. Fleetguard, Inc.,* 900 F.Supp. 1110, 1119–23 (N.D.Iowa 1995); *Reedy,* 890 F.Supp. at 1431–35. Recent decisions of the Iowa Supreme Court are in accord with the principles this court has previously expounded. *See Huegerich v. IBP, Inc.,* 547 N.W.2d 216 (Iowa 1996); *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277 (Iowa 1995).

■ As the law now stands in Iowa, the general rule is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel v. City of Perry,* 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas,* 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.,* 495 N.W.2d 768, 769 (Iowa 1993); *Grahek v. Voluntary Hosp. Co-op. Ass'n of Iowa, Inc.,* 473 N.W.2d 31, 34 (Iowa 1991); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989).

The Iowa Supreme Court has recognized two exceptions to this general rule in which a cause of action for wrongful discharge of an at-will employee will lie: The first is where the discharge is in clear violation of a "well-recognized and defined public policy of this state," and the second is where a contract is created by an employer's handbook or policy manual. *Huegerich,* 547 N.W.2d at 220 (reaffirming these two exceptions and rejecting a "negligent discharge" cause of action as a further exception to at-will employment); *Borschel,* 512 N.W.2d at 566; *French,* 495 N.W.2d at 769–70; *Fogel,* 446 N.W.2d at 455; *see also Clarey v. K–Products, Inc.,* 514 N.W.2d 900, 902 (Iowa 1994) (court has recognized exception to at-will employment where discharge occurs for reasons contrary to public policy); *Lara,* 512 N.W.2d at 782 (case involved "one of the exceptions," discharge in violation of public policy); *Grahek,* 473 N.W.2d at 34 ("termination of an employment at-will is generally not actionable in the absence of discrimination or a public policy violation."); *Vaughn,* 459 N.W.2d at 638 (public policy exception only discussed); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 355 (Iowa 1989) (public policy exception only discussed); *Vaughn v. City of Cedar Rapids,* 527 N.W.2d 411, 413 (Iowa Ct.App.1994) (citing *Fogel* for exceptions of violation of public policy and creation of contract in handbook).[11] The public policy exception is based on the theory that the law should not allow employees to be fired for reasons that violate public policy. *Borschel,* 512 N.W.2d at 567 (citing 82 Am.Jur.2d, *Wrongful Discharge* § 15, at 687 (1992)).

 Under the public policy exception, the Iowa Supreme Court has recognized causes of action for tortious discharge where an employer's retaliatory discharge would conflict with certain legislatively declared goals. *Lara,* 512 N.W.2d at 782. Such policies may be expressed in the constitution and the statutes of the state, *Borschel,* 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), although enforcement of the tort based on some policies

is preempted by enforcement under the statutes embodying those policies themselves:

> The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty. *See, e.g.,* Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts. *Hamilton v. First Baptist Elderly Hous. Found,* 436 N.W.2d 336, 341–42 (Iowa 1989).

*Borschel,* 512 N.W.2d at 567–68. The *Borschel* court then identified the circumstances in which Iowa courts had found a public policy basis for the tort:

> In the absence of an express prohibition, the court of appeals found an implied cause of action for wrongful termination when the reason for discharge is the employee's failure or refusal to violate a law in the course of employment. *Wilcox v. Hy–Vee Food Stores, Inc.,* 458 N.W.2d 870, 872 (Iowa App.1990). The court of appeals found that the violation of a statute prohibiting an employer from requiring an employee to take a polygraph examination was a violation of public policy, thus a private cause of action existed. *Id.* at 872. At the time the claim arose the statute did not expressly allow for a cause of action. This statute was later amended to so provide. *Id.*
>
> Also we have found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment. *See Lara v. Thomas,* 512 N.W.2d 777, 780 (Iowa 1994) (discharge in retaliation for filing partial unemployment claim); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351,

---

**11.** Although the Hospital has expended considerable effort demonstrating that the handbook exception is inapplicable here, Hanson does not assert a handbook exception. Hanson has only pleaded and argued the public policy exception in this case.

353 (Iowa 1989) (employee discharged because she threatened to file a workers' compensation claim); *Springer [I]*, 429 N.W.2d at 560 (cause of action exists when the employee's discharge serves to frustrate the public policy expressed in the workers' compensation statute).

*Borschel*, 512 N.W.2d at 568. A wrongful or retaliatory discharge in violation of public policy is therefore an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. *Niblo*, 445 N.W.2d at 355 (citing *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir.1979)). The remedy for the tort should be for the employee's complete injury, including out-of-pocket loss of income and causally connected emotional harm. *Id.*

#### a. Retaliation based on sick leave

In the present case, even assuming there is public policy protection from discharge of an employee for making or appearing likely to make a claim for sick leave, a matter Hanson has not demonstrated adequately, the court finds not the merest inference in the record that sick leave benefits motivated any action by the Hospital. Hanson made no inquiry about or demand for sick leave benefits and expressed no intention to use any of her sick leave. The court cannot find that coincidence of termination with a stay in the hospital for which no sick leave was sought raises sufficient inference that a jury question is presented on termination in retaliation for use or likely use of sick leave benefits, and the court finds nothing else in Hanson's pleadings, briefing, or the record. Hanson has failed to designate support for this claim in the record as required. *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. The lack of a genuine issue of material fact on this claim requires summary judgment in favor of the Hospital on this version of the "public policy" claim. *Fed.R.Civ.P.* 56(c); *see also Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co.*, 81 F.3d at 791; *Beyerbach*, 49 F.3d at 1325; *Munz*, 28 F.3d at 798; *Roth*, 25 F.3d at 708; *Cole*, 993 F.2d at 1331;

*Woodsmith Publishing Co.*, 904 F.2d at 1247; *Wabun–Inini*, 900 F.2d at 1238.

#### b. Retaliation based on an assertion of confidentiality

Hanson's alternative claim of discharge in violation of public policy fares rather better. That claim is based on allegations of termination in retaliation for her efforts to maintain her right to confidentiality of her hospitalization. The court finds the necessary statement of public policy regarding confidentiality of patient hospital records embodied in Iowa Code § 22.7(2), which requires that hospital records be kept confidential. The inference that Hanson was terminated in retaliation for asserting a right to confidentiality of her hospital stay purportedly arises from the termination letter sent to her by Lyola Tulp, in which Tulp remarked, "I have been informed that you recently had surgery at HCMH and are recuperating at home. I learned of this, not from you, which should have been the case, but from noting your name on the patient dietary records yesterday morning, and inquiring if it was you." Defendant's Exhibit H. Tulp also stated, "This most recent incident, not telling me you were having surgery so I could modify the work schedule, but instead finding your own replacements, is just the last of a long, long history of unacceptable behavior." *Id.*

Although the court is of the opinion that these remarks do not demonstrate that Tulp was terminating Hanson for asserting her right to confidentiality of her stay, but for failing to advise Tulp of an imminent absence, there is sufficient ambiguity to suggest that a reasonable factfinder could infer that Hanson was terminated for the former reason. *Hartnagel*, 953 F.2d at 396 (the trial court must "assess the adequacy of the non-movants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial."); *Johnson*, 906 F.2d at 1237 (the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial). However, even giving Hanson the benefit of all doubts, the inferences upon which this claim depends are extremely

weak. Nonetheless, summary judgment must be denied upon this claim in light of barely reasonable inferences and genuine issues of material fact as to the cause of the Hospital's termination of Hanson.[12]

### 6. *Malicious prosecution and abuse of process*

The last two counts of Hanson's complaint not yet addressed are a claim of malicious prosecution and a claim of abuse of process. Count V, the malicious prosecution claim, is founded on allegations that the Hospital wrongfully prosecuted an action to deny Hanson unemployment benefits, but that the proceedings in question, administrative proceedings before the Iowa Department of Job Service, ended favorably to Hanson. Count VI, which is founded on similar allegations, alleges that the Hospital abused legal process in the Job Service proceedings to compel Hanson to disclose confidential information concerning her stay at the Hospital. The Hospital asserts that it is entitled to summary judgment on these claims, because it did not initiate the actions of which Hanson complains, but had a right to resist Hanson's claim for unemployment compensation, and because it had a reasonable basis for such a resistance. The Hospital also asserts that it did not abuse process for an improper purpose, but instead only pursued the process to its authorized conclusion. The court turns first to a discussion of the nature and elements of these two torts under Iowa law.

### a. *Malicious prosecution*

 According to the Iowa Supreme Court, the "primary purpose" of the tort remedy for malicious prosecution "is to provide relief in those cases in which a plaintiff brings a meritless suit *and* has an improper motive for bringing it." *Wilson v. Hayes,* 464 N.W.2d 250, 259 (Iowa 1990) (citing *Wong v. Tabor,* 422 N.E.2d 1279, 1283 (Ind. Ct.App.1981), with emphasis supplied by the Iowa Supreme Court). The Iowa Supreme Court makes no distinction between prosecution of a criminal case and assertion of a civil claim. *Id.* However, "[c]ourts have not favored the remedy and so have construed its requirements strictly against the malicious prosecution plaintiff." *Id.*

 The elements of malicious prosecution under Iowa law are as follows: (1) a previous prosecution; (2) instigation of that prosecution by the present defendant; (3) termination of that prosecution by acquittal or discharge of the present plaintiff; (4) want of probable cause; (5) malice on the part of the defendant for bringing the prosecution; and (6) damage to the plaintiff. *Employers Mut. Cas. Co. v. Cedar Rapids Television Co.,* 552 N.W.2d 639, 643, (Iowa 1996); *Wilson,* 464 N.W.2d at 259; *Elliott v. Clark,* 475 N.W.2d 663, 665 (Iowa Ct.App.1991); *see also* Restatement (Second) of Torts §§ 674, 681A (setting forth comparable elements). The court will look briefly at some of these elements.

 "Probable cause" for a civil action, the lack of which establishes the fourth element of the tort, is "knowledge of a state of facts which would lead a person of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that the suit is justified." *Brown v. Monticello State Bank,* 360 N.W.2d 81, 87 (Iowa 1984); *see also Elliott,* 475 N.W.2d at 666 (applying this definition, citing *Brown,* in the context of a malicious prosecution claim). One does not need to be "certain of the outcome." *Wilson,* 464 N.W.2d at 261. Rather, the test is an objec-

---

12. The court's perhaps excessive caution in allowing this marginal claim to proceed is founded, at least in part, on the fact that this is the only claim in the case that can be construed to be an "employment discrimination" claim. The Eighth Circuit Court of Appeals has remarked that summary judgment should only rarely be granted on employment discrimination claims, because they so often depend upon inferences from circumstantial evidence. *See, e.g., Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991)); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson,* 931 F.2d at 1244, and *Hillebrand,* 827 F.2d at 364).

tive one of whether there are "reasonable grounds for believing the suit is justified." *Id.*

The improper purpose or "malice" element of the tort, the fifth element, has been defined by the Iowa Supreme Court in accordance with § 676 of the Restatement:

*Propriety of Purpose*

To subject a person to liability for wrongful civil proceedings, the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based.

*Wilson,* 464 N.W.2d at 260. Thus, improper purposes including bringing a suit while aware that the claim has no merit; beginning the proceedings because of hostility or ill will; initiating the matter solely for the purpose of depriving the other party of a beneficial use of property; or bringing suit for the purpose of forcing a settlement which has no relation to the merits of the claim. *Id.* The Iowa Supreme Court noted that the important difference between "malice" sufficient to sustain the tort and "improper purpose" as defined in § 676 of the Restatement is that "[u]nder our definition malice may be inferred from a want of probable cause," while under the Restatement section, "a finding of an improper purpose must be supported by evidence independent of the evidence establishing a want of probable cause." *Id.*

 The damage to the plaintiff, the sixth element of the .tort, must be for an arrest of the person, seizure of property, or "special injury," which is an injury that would not ordinarily result in all similar cases involving the claim against the plaintiff. *Employers Mut. Cas. Co.,* 552 N.W.2d at 643; *Royce v. Hoening,* 423 N.W.2d 198, 200 (Iowa 1988); *Elliott,* 475 N.W.2d at 665.

 One final point concerning the nature of this tort claim is that advice of counsel is a complete defense to such a claim, if that advice is obtained in good faith and if

the attorney is given a full and fair disclosure of all facts in possession of the client. *Brown v. Monticello State Bank of Monticello, Iowa,* 420 N.W.2d 475, 477 (1988). This defense has not been asserted here by the Hospital, possibly in light of the Hospital's assertion that Hanson cannot make out the elements of her claim without regard to any defenses.

### b. Abuse of process

 Under Iowa law, the tort of abuse of process is similar to that of malicious prosecution, in that both involve "improvident use of the courts." *Wilson,* 464 N.W.2d at 266. The Iowa Supreme Court recognized the difference between the two torts as follows:

The focus ... is slightly different:

Malicious prosecution occurs when an action is instituted without foundation. Conversely, abuse of process may be found when [legal process] is ... used to attain a collateral objective beyond that anticipated by the process. An ulterior motive does not alone satisfy the requirement for an action in abuse of process; a definite act or threat outside the process is required.

[Note, *A Lawyer's Duty to Reject Groundless Litigation,* 26 Wayne L.Rev.] at 1555–56; *see also Grell v. Poulsen,* 389 N.W.2d 661, 663 (Iowa 1988).

*Wilson,* 464 N.W.2d at 266.[13] Thus, the Iowa Supreme Court has defined abuse of process as use of " 'legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed.' " *Id.* (quoting *Schmidt v. Wilkinson,* 340 N.W.2d 282, 284 (Iowa 1983)); *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W.2d 203, 209 (Iowa 1995) (providing the same definition, but citing *Palmer v. Tandem Mgt. Servs.,* 505 N.W.2d 813, 817 (Iowa 1993)). The "improper purpose" in the context of this tort, therefore, is " 'ordinarily an attempt to secure from another some collateral advantage

---

**13.** A further difference between the torts identified by the Iowa Supreme Court, but not applicable here, is that "while abuse of process may be raised as a counterclaim, a claim for malicious prosecution may not; such an action must await

final determination of the underlying case." *K. Carr v. Hovick,* 451 N.W.2d 815, 817 (Iowa 1990) (citing *Galloway v. Zuckert,* 424 N.W.2d 437, 440 (Iowa 1988)).

not properly includable in the process itself.'" *Id.* (quoting *Schmidt*, 340 N.W.2d at 284–85. Thus, an abuse of process can occur even though there is probable cause to bring the action and the original action terminates in favor of the plaintiff in that action. *Id.* Apart from damages, abuse of process has two elements: (1) use of legal process, and (2) use of the legal process in an improper or unauthorized manner. *Id.* (citing *Tomash v. John Deere Indus. Equip. Co.*, 399 N.W.2d 387, 390 (Iowa 1987)); *Johnson*, 533 N.W.2d at 209.

■■■■ The first element can generally be shown by the use of a legal process against the plaintiff. *Wilson*, 464 N.W.2d at 266. The second element "is difficult to establish." *Johnson*, 533 N.W.2d at 209. The second element requires proof that "the defendant used the legal process *primarily* for an impermissible or illegal motive." *Wilson*, 464 N.W.2d at 266 (emphasis in the original); *Johnson*, 533 N.W.2d at 209 (citing *Wilson*). The crux of such a claim is often the meaning of "primarily" as applied to the second element. "'A prerequisite for recovery is evidence that the person committed some act in the use of process that was not proper in the regular prosecution of the proceeding.'" *Johnson*, 533 N.W.2d at 209 (quoting *Grell v. Poulsen*, 389 N.W.2d 661, 664 (Iowa 1986)). Proof of "malice" or "improper motive" do not establish this second element. *Id.* The Iowa Supreme Court thus takes a restrictive view of the primary purpose element, holding that

> abuse of process will not lie for a civil action which inconveniences a defendant, or for one filed in expectation of settlement (a "nuisance" suit). Additionally, there is no abuse of process when the action is filed to intimidate and embarrass the defendant knowing there is no entitlement to recover the full amount of damages sought.

All of this is true as long as the act that is alleged to be improper, is in fact proper in the regular prosecution of the proceeding. Put another way, the defendant is not liable if he has done no more than carry the process to its authorized conclusion, even with bad intentions.

*Wilson*, 464 N.W.2d at 267 (internal quotations and citations omitted); *Johnson*, 533 N.W.2d at 209.

### c. The improper prosecution claims here

The court concludes that Hanson's malicious prosecution claim is fatally flawed in an important respect rarely touched on by the courts. Hanson's protestations to the contrary notwithstanding, the Hospital did not initiate the Job Service proceedings of which Hanson complains; Hanson did. Hanson asserts that she is not the party who initiated the contested proceedings, because she filed a claim authorized by statute, citing Iowa Code Ch. 96. However, Iowa Code Ch. 96 also gives an employer the right to resist an application for benefits and to appeal decisions of the Job Service representatives and ALJs. Iowa Code § 96.6. Although the employer bears the burden to demonstrate an employee is not qualified for benefits, the claim for benefits is still brought by the former employee and the claimant still bears the initial burden of producing evidence showing that the claimant is not disqualified. Iowa Code § 96.6(2). However, assuming that Hanson could demonstrate that the Hospital initiated a malicious prosecution against her, her claim must otherwise fail on summary judgment.

First, as to malicious prosecution, the court finds that the Hospital, as a matter of law, had "probable cause" to resist Hanson's claim for benefits. *Employers Mut. Cas. Co.*, 552 N.W.2d at 643; *Wilson*, 464 N.W.2d at 259; *Elliott*, 475 N.W.2d at 665. Hanson has failed to generate a genuine issue of material fact that the Hospital had no "knowledge of a state of facts which would lead a person of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that the suit is justified." *Brown*, 360 N.W.2d at 87. Instead, the Hospital reasonably, if incorrectly according to the Job Service determinations, believed that Hanson was fired for misconduct. Although the court believes no reasonable juror could believe from the record that the Hospital lacked probable cause to contest Hanson's claim for benefits, assuming for the sake of argument that any determination of

objective reasonableness on the question, *Wilson,* 464 N.W.2d at 261, would be for the jury to decide, the court will also consider other elements of Hanson's claim.

An assumption of a jury question as to the lack of probable cause is in effect also an assumption that there is an inference of the requisite "malice," because "malice" can be inferred from the lack of probable cause. *Wilson,* 464 N.W.2d at 260. What is ultimately fatal to Hanson's malicious prosecution claim, therefore, is her failure to generate a genuine issue of material fact as to "special injury," the final element of the claim in a case such as this where there is no arrest or seizure of property. *Employers Mut. Cas. Co.,* 552 N.W.2d at 643; *Royce,* 423 N.W.2d at 200; *Elliott,* 475 N.W.2d at 665. There is nothing in the record from which an inference could arise of an injury that would not ordinarily result in all similar cases involving the claim against the plaintiff. *Id.; Royce,* 423 N.W.2d at 200; *Elliott,* 475 N.W.2d at 665. Hanson appears to attempt to meet this requirement by asserting that she was put to the expense of pursuing administrative proceedings and appeals and loss of the confidentiality she demanded. However, a claim for benefits necessarily opened the door to these "injuries," as they were part and parcel of the circumstances surrounding Hanson's discharge and the administrative proceedings to determine her eligibility for benefits.

Thus, the court concludes that Hanson has not been able to generate a genuine issue of material fact on at least three of the elements of her malicious prosecution claim, and summary judgment is therefore appropriate in the Hospital's favor on this claim.

■ As to the abuse of process claim, the court's resolution is simpler. Nothing in the record raises an inference that the Hospital has done anything more than carry the Job Service process to its authorized conclusion, even if there were any inference of bad intentions. *Johnson,* 533 N.W.2d at 209; *Wilson,* 464 N.W.2d at 267. Hanson has failed to generate a genuine issue of material fact on her burden to prove that "the defendant used the legal process *primarily* for an impermis-

sible or illegal motive." *Wilson,* 464 N.W.2d at 266; *Johnson,* 533 N.W.2d at 209. Rather, the record only supports the inference that the Hospital used the process to assert its contention that Hanson was not entitled to unemployment compensation, because she had been terminated for misconduct. Summary judgment will be granted in favor of the Hospital on the abuse of process claim as well.

### V. CONCLUSION

The court concludes that the Hospital's motion for summary judgment should be granted in part and denied in part. Looking first at the only federal claim, Hanson's due process claim, the court denies leave at this late date for either an implicit or explicit amendment of the due process claim based on arguments in Hanson's resistance brief. In her brief, Hanson appears to assert a due process claim based on deprivation of a "property" right to privacy. However, Hanson only pleaded a due process claim based on deprivation of property rights in sick leave. As to the sick leave claim, the court finds that the availability of an adequate post-deprivation remedy under state law precludes a federal due process claim. Summary judgement is therefore granted as to Count VII.

Although the court has the discretion to dismiss the remaining state-law claims in the absence of a federal claim, the court will not do so in this case, owing to the investment this court and the parties have made in time and energy, and the imminent trial date in this court, which it is unlikely could be matched for the prompt disposition of all claims in state court. Instead, the court will dispose of the motion for summary judgment as to the remaining state law claims and hear the trial in this matter.

This matter will indeed proceed to trial on one of the state-law claims. The court finds that no genuine issue of material fact has been generated that any intrusion upon Hanson's seclusion was "highly offensive." Furthermore, Hanson has failed to generate a genuine issue of material fact that any "publicity" occurred, as "publicity" is defined

under applicable law. Hence, Hanson's alternative privacy claim of unreasonable publicity must also fail. Summary judgment as to Count I is therefore granted. Summary judgment is also granted as to Hanson's conversion claim in Count II. Hanson has failed to demonstrate, as a matter of law, that a privacy interest is a "property" interest, or, if it could otherwise be a property interest, that it is one of the narrowly defined "intangible" property interests to which a conversion claim could apply. Summary judgment is also granted as to Count III, which asserts a claim of intentional infliction of emotional distress. The court finds that the conduct alleged is not sufficiently outrageous as a matter of law. Even assuming the conduct to be sufficiently outrageous and that the allegedly outrageous conduct was the cause of any distress, Hanson failed to designate portions of the record suggesting an inference of sufficient emotional distress to meet the Iowa Supreme Court's stringent standards for this element of the claim. Similarly, summary judgment is granted as to that part of Count IV alleging a claim of discharge in violation of public policy based on retaliation for exercise or likely use of sick leave rights. Hanson has failed to designate support for this claim in the record as required. However, summary judgment is denied as to that part of Count IV alleging a claim of discharge in violation of public policy by retaliating for the exercise of privacy rights. Reasonable inferences in the record, though inferences the court finds extremely weak, suggest that the Hospital might be found to have retaliated against Hanson for failing to disclose her hospital stay, not for failing to advise her supervisor of a need for substitutes and obtaining substitutes on her own. Finally, summary judgment is granted as to the claims in Counts V and VI, which assert malicious prosecution and abuse of process, respectively. The court can find no genuine issues of material fact or reasonable inferences barring summary judgment on these claims. The Hospital did not initiate the proceedings of which Hanson complains, but instead defended Hanson's claim for unemployment benefits as it was entitled to do under statute. Furthermore, as to malicious prosecution, the court finds that Hanson has failed to generate a genuine issue of material fact that the Hospital did not have probable cause for its position in those proceedings. Yet, even assuming that it did not have probable cause, what is ultimately fatal to Hanson's malicious prosecution claim, is her failure to generate a genuine issue of material fact as to "special injury," the final element of the claim in a case such as this where there is no arrest or seizure of property. As to the abuse of process claim, nothing in the record raises an inference that the Hospital has done anything more than carry the Job Service process to its authorized conclusion, even if there were any inference of bad intentions.

Summary judgment is therefore **granted** as to Counts I, II, III, V, VI, and VII, and **granted in part and denied in part** as to Count IV. This matter will proceed to trial on the remaining claim as scheduled on September 3, 1996.

**IT IS SO ORDERED.**